**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Zebuel Jackson HANNA, Defendant–Appellant.**

**No. 00–10238.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 15, 2001.

Submission Vacated Nov. 20, 2001.

Resubmitted and Filed June 20, 2002.

Glynn B. Cartledge, Reno, Nevada, for the defendant-appellant.

L. Anthony White, Assistant United States Attorney, Reno, Nevada, for the plaintiff-appellee.

Before SCHROEDER, Chief Judge, and LAY * and BOOCHEVER, Circuit Judges.

## OPINION

BOOCHEVER, Circuit Judge.

Defendant Zebuel Jackson Hanna appeals his conviction on seven counts of making threats against the President of the United States in violation of 18 U.S.C. § 871(a). We reverse and remand for a new trial.

## BACKGROUND

Hanna prepared, photocopied and distributed a variety of documents that suggested in one way or another that President Bill Clinton should be killed. These leaflets or letters all contain some combination of handwritten words, drawings, photographs, and passages cut out from the Bible. Hanna mailed or hand-delivered the letters to neighbors, businesses and state and local government offices throughout the United States [1] at various times during 1997 and 1998. He did not send any to President Clinton, the President's aides, or any federal agencies.

Four principal documents underlie the charges on which Hanna was convicted. The first document contains the words "KILL THE BEAST" in handwritten capitals along the top of the page. Underneath this heading are a few handwritten comments as well as two stick figures which apparently represent President Clinton and First Lady Hillary Clinton. Above the President figure is the number

---

* The Honorable Donald P. Lay, Senior Circuit Judge for the Eighth Circuit Court of Appeals, sitting by designation.

1. In addition to his neighbors, Hanna delivered or mailed his writings to a local bank; two local law offices; the mayor's office in Decatur, Illinois; the mayor's office in Mobile, Alabama; the Office of the President of the University of Nevada, Reno; and the office of the Town of Fernley.

"666" and the name "willie jeffer jackal." The stick figure with the name "HIL-LARY" above it is pointing at the President figure and appears to be saying "you said you danced all night."

The second document contains about a dozen disjointed, handwritten comments, several passages cut out from the Bible, and a picture of President Clinton at Supreme Court Justice Ruth Bader Ginsburg's swearing-in. At the bottom of the page, it reads "William Jefferson Blythe 3rd, Mr. buzzard's feast, WANTED For MURDER, DEAD OR ALIVE." In very small print, one of the biblical passages reads, "If a man also lie with mankind, as he lieth with a woman, both of them have committed an abomination: they shall surely be put to death; their blood shall be upon them."

The third document contains the words "WANTED FOR MURDER" printed in large, bold capitals, taking up approximately a third of the page. Directly below is the picture of President Clinton at Justice Ginsburg's swearing-in. Next to the picture, there is a handwritten comment, "17 little Angels Murdered by Beast Blythe and his 666 Molesters." An arrow is drawn from the phrase "Beast Blythe" to the President's picture. Below the picture in mostly capitals are the words, "WILLIAM JEFFERSON BLYTHE 3rd, alias Willie the Clinton, alias Rev. HIV 3rd, AND His 666 MOLESTERS, DEAD OR ALIVE."

The fourth document reads along the top, in handwritten lettering, "All filth herein will be hanged by the feet and their throat slit." Below is a list of approximately thirty names, including "sweet willie Blythe," and a variety of other handwritten comments. These messages are written on the face of a formal court document entitled, "Petition for Court Ordered

Involuntary Admission." Apparently, this legal document had been filed to commit Hanna to psychiatric treatment approximately one year prior to his arrest.

Hanna generally delivered to the same people some combination of the four documents described above together with several, sometimes a dozen, other leaflets reflecting similar themes.

Hanna was charged with eleven counts of making threats against the President of the United States in violation of 18 U.S.C. § 871(a). At trial, several recipients of Hanna's letters testified that they found the communications to be very disturbing. Also, several law enforcement officers who had participated in the investigation testified about their reactions to Hanna's letters and explained why they believed the writings were serious threats against the President. The jury returned a guilty verdict on seven of the eleven counts. Hanna appeals.

## DISCUSSION

Hanna argues that the convictions should not stand because: (1) 18 U.S.C. § 871(a) is unconstitutionally overbroad in violation of the First Amendment, (2) the district court erroneously admitted testimony from law enforcement officers concerning their interpretation of Hanna's communications, and (3) Hanna's communications were not "true threats" as required by § 871(a) and the First Amendment.

### I.

Hanna suggests that in order for § 871(a) to survive a facial challenge on First Amendment overbreadth grounds, we must interpret it as requiring proof that he subjectively intended to threaten the President.[2] This argument, however, has been repeatedly rejected.

2. 18 U.S.C. § 871(a) provides in relevant part:

In *Watts v. United States,* 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969) (per curiam), the Supreme Court held § 871(a) facially constitutional, stating that "[t]he Nation undoubtedly has a valid, even an overwhelming, interest in protecting the safety of its Chief Executive and in allowing him to perform his duties without interference from threats of physical violence." *Id.* at 707, 89 S.Ct. 1399. Although the Court indicated that threat statutes "must be interpreted with the commands of the First Amendment clearly in mind," it left no doubt that true threats could be criminalized because they are not protected speech. *Id.*

In *Roy v. United States,* 416 F.2d 874 (9th Cir.1969), the Ninth Circuit defined "threat" for the purposes of § 871(a) and held that subjective intent was not required for criminal liability. Observing that one of the purposes of § 871(a) was to avoid "the detrimental effect upon Presidential activity and movement that may result simply from a threat upon the President's life," we held that a defendant is liable under § 871(a) if the defendant intentionally make[s] a statement, written or oral, in a context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of an intention to inflict bodily harm upon or to take the life of the President. . . .

*Id.* at 877. Although no First Amendment challenge was raised in *Roy, see id.* at 879 n. 17, subsequent cases have made clear that *Roy*'s "reasonable speaker" standard does not violate the First Amendment. *See Planned Parenthood of the Co-*

*lumbia/Willamette, Inc. v. Am. Coalition of Life Activists,* 290 F.3d 1058, 1073 (9th Cir.2002) (en banc); *United States v. Orozco–Santillan,* 903 F.2d 1262, 1265–66 (9th Cir.1990); *United States v. Mitchell,* 812 F.2d 1250, 1255–56 (9th Cir.1987); *United States v. Merrill,* 746 F.2d 458, 462 (9th Cir.1984).

■ Hanna nevertheless contends that our settled precedent on this issue has been called into question by the Supreme Court's decision in *Clinton v. Jones,* 520 U.S. 681, 117 S.Ct. 1636, 137 L.Ed.2d 945 (1997). In *United States v. Twine,* 853 F.2d 676, 680–81 (9th Cir.1988), we held that specific intent is required to impose criminal liability for threats against private individuals, but not for threats against the President, because "[a] threat against the President may cause substantial harm and is qualitatively different from a threat against a private citizen or other public official." *Id.* at 681 (*quoting Roy,* 416 F.2d at 877) (emphasis deleted). Hanna contends *Clinton* undermines the premise in *Twine* and *Roy* that the President should be treated differently than a private citizen.

We are not persuaded. *Clinton* addressed an entirely different question— whether a federal court could, consistent with the separation of powers doctrine, exercise jurisdiction over a private lawsuit against the President for conduct unrelated to his official duties as President that occurred before he assumed office. Consequently, *Clinton* sheds no light on the issue before us, and in no way undermines our previous conclusion that threats against the President are "qualitatively different" than threats against private per-

Whoever knowingly and willfully deposits for conveyance in the mail ... any ... document containing any threat to take the life of, to kidnap, or to inflict bodily harm upon the President of the United States ... or knowingly and willfully otherwise makes any such threat against the President ... shall be fined under this title or imprisoned not more than five years, or both.

sons. Indeed, the Supreme Court in *Clinton* recognized that the Presidency is "a unique office" with "vast and important" powers and responsibilities, such that "high respect ... is owed to the office of the Chief Executive." *Clinton*, 520 U.S. at 697–99, 707, 117 S.Ct. 1636.

Accordingly, we reject Hanna's claim that § 871(a) is unconstitutionally overbroad in the absence of a specific intent requirement.

## II.

Hanna also contends that the district court abused its discretion by allowing several law enforcement officers to testify that they understood Hanna's communications to be serious threats to kill the President. We review the district court's evidentiary rulings at trial, including its decision to admit expert testimony, for an abuse of discretion. *United States v. Campos*, 217 F.3d 707, 710 (9th Cir. 2000); *United States v. Ramirez*, 176 F.3d 1179, 1182 (9th Cir.1999). Evidentiary rulings will be reversed for abuse of discretion"only if such nonconstitutional error more likely than not affected the verdict." *Ramirez*, 176 F.3d at 1182 (quotation marks omitted). Reversal is not required if the error is harmless beyond a reasonable doubt. *United States v. Lennick*, 18 F.3d 814, 821 (9th Cir.1994).

At Hanna's trial, three Secret Service agents and one police commander testified to their extensive experience, training and expertise in protecting public officials and in assessing whether a particular person constitutes a serious threat to the President. These officers had obtained Hanna's documents from the individuals and organizations to whom Hanna had delivered or mailed his communications. The law enforcement witnesses described their reactions to Hanna's letters and indicated that they believed the writings were serious threats against the President.

For example, Secret Service Agent Jim Luttig testified that he found Hanna's communications "disturbing" and suggested that they were indeed "threats." Richard Ryan, a patrol commander for the Decatur, Illinois Police Department, explained that Hanna's writings made a "specific reference to killing the President," that the writer had a desire to kill the President, and that the desire was strong and more likely to manifest itself in action, in light of the Satanic references and religious foundation of the expressed beliefs. Secret Service Agent Gail Ruth Linkins described Hanna's letters as "correspondence that threaten [sic] to kill the president." Over defense counsel's objection, the district court allowed this statement, explaining that Agent Linkins was qualified to give that opinion considering her experience and expertise. Agent Linkins went on to testify, "When I read the document, I believed the author had intended to threaten to kill the president."

The Government's principal witness, Secret Service Agent Jim Deal, provided an extensive description of which pictures, phrases and references in Hanna's writings caused him concern and why. The district court endorsed this presentation by stating in response to one of defense counsel's repeated objections, "I would like the witness to point out, without the needless presentation of cumulative evidence, what in these exhibits he as an expert in threat assessment considers significant just so the jury knows that they are." In addition to Agent Deal's discussion of which aspects of Hanna's letters disturbed him, he repeatedly characterized the communications as "threats" and concluded that "they seem threatening in nature basically." The district court overruled defense counsel's objection to this conclusion,

explaining, "This is his job." Moreover, the district court treated much of this law enforcement testimony as expert testimony.

██ We agree with Hanna that the district court abused its discretion in allowing this testimony. Expert testimony is admissible under Fed.R.Evid. 702 if it addresses an issue "beyond the common knowledge of the average layperson." [3] *United States v. Morales,* 108 F.3d 1031, 1039 (9th Cir.1997) (en banc). Here, the issue the jury was called upon to decide was whether a reasonable person in Hanna's position would foresee that his communications would be perceived by those to whom he communicated as serious expressions of intent to harm the President. Without additional assistance, the average layperson is qualified to determine what a "reasonable person" would foresee under the circumstances. *See United States v. Whitfield,* 31 F.3d 747, 749 (8th Cir.1994) (expert testimony on whether defendant accused of making threats was actually a threat to victim was properly excluded because it was "not probative of the issue of whether a reasonable recipient, knowing what she knew about the writer of the letters, would have interpreted them as a threat"); *cf. Torres v. Johnson Lines,* 932 F.2d 748, 751 (9th Cir.1991) (expert testimony properly excluded where record did not reveal "any specific evidence that was so technical or complex that a jury could not have grasped it without the aid of experts"); *Shaw v. Lindheim,* 919 F.2d 1353, 1356 (9th Cir. 1990) (in copyright infringement case, expert testimony not appropriate for determining whether a reasonable person would find similarity between artistic works).

Moreover, the probative value of this testimony was minimal. Hanna did not send his writings to the law enforcement and Secret Service agents. He distributed letters to neighbors, businesses and governmental organizations, which then forwarded the documents to the police or the Secret Service. The true threat test turns on whether a reasonable person would foresee that a statement would be interpreted as a threat "by those to whom the maker communicates." *See Roy,* 416 F.2d at 877; *see also Mitchell,* 812 F.2d at 1255 (court may consider "reaction of the listeners"); *Malik,* 16 F.3d at 49 (effect on "addressee" is highly relevant). Because Hanna did not communicate with the law enforcement officers, their reactions to the documents had little bearing on the question at issue—what a reasonable person in Hanna's position would have foreseen with regard to the persons with whom he communicated.

Indeed, the law enforcement officers were particularly unqualified to comment on what the "reasonable person" would have foreseen. Because of their extensive training, experience and expertise, law enforcement officers and especially Secret Service agents, would see potential dangers to the President which a reasonable person receiving Hanna's documents might not notice or would consider innocuous. In this case, using highly trained agents to determine what a reasonable person would foresee was like using a bloodhound to determine whether the average person would pick up a scent.

██ The impact of the agents' testimony was no doubt prejudicial. The testimony, along with the district court's approval of it, posed a significant danger of mislead-

---

**3.** Rule 702 provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

ing the jury into believing that it should judge Hanna's letters from the perspective of a highly trained Secret Service agent instead of from the perspective of an average, reasonable person. This substantially lowered the bar for the Government for proving the principal issue at trial—whether Hanna's letters constituted a true threat.

In addition, the error was not harmless beyond a reasonable doubt. The expert opinion testimony created a significant danger that the jurors would conclude erroneously that they were not the best qualified to assess the foreseeable reaction to Hanna's letters, that they should second guess their own judgment, and that they should defer to the Government's experts. *See United States v. Gonzalez–Maldonado,* 115 F.3d 9, 18 (1st Cir.1997) ("Expert testimony on a subject that is well within the bounds of a jury's ordinary experience generally has little probative value. On the other hand, the risk of unfair prejudice is real. By appearing to put the expert's stamp of approval on the government's theory, such testimony might unduly influence the jury's own assessment of the inference that is being urged."). In addition, in the present case, the government prompted the jurors to defer to the expert opinions of its witnesses. In closing argument, the prosecution vouched for its witnesses by positing that it was unlikely the officers would lie or make a mistake in judgment given their extensive experience and commitment to law enforcement.[4] *See United States v. Frederick,* 78 F.3d 1370, 1378 (9th Cir.1996) ("It is improper for the prosecution to vouch for the credibility of a government witness" or "place the pres-

tige of the government behind the witness.") (quotation marks deleted).

We therefore conclude that Hanna is entitled to a new trial, in which the evidence is limited to that which is relevant

### III.

■ Finally, we consider Hanna's claim that there was insufficient evidence to support the jury's conclusion that his communications were "true threats" under § 871(a) and the First Amendment. As discussed above, a statement is true threat for the purposes of § 871(a) and the First Amendment if a reasonable speaker would foresee that those to whom he makes the statement would interpret the statement as a serious expression of intent to inflict death or bodily harm on the President. If it were clear, as a matter of law, that the speech in question was protected, we would be obligated to remand not for a new trial, but for a judgment of acquittal. *See Planned Parenthood,* 290 F.3d 1058, 1070. If, on the other hand, "there were material facts in dispute or it was not clear that[the communications] were protected expression or true threats," it was appropriate to submit the issue, in the first instance, to the jury. *Id.*

■ We conclude that the present case was properly submitted to the jury. "Whether a defendant's words constitute a true threat under 18 U.S.C. § 871 must be determined in light of the entire factual context of the defendant's statements." *Mitchell,* 812 F.2d at 1255. This context includes "the surrounding events, the reaction of the listeners, and whether the words are expressly conditional." *Id.*

---

4. The Government rhetorically asked the jury: Do you really believe the Secret Service Agents and the FBI agents who came in here with a total of somewhere exceeding 150 years of federal law enforcement expe-

rience, not counting Agent Deal, would come in here and drum up a case and act— sit on the stand and act like they thought this stuff was serious to get a harmless old man? Or were they being sincere?

There was extensive documentary evidence, in which Hanna stated or at least suggested that the President should be killed. Although Hanna did not explicitly indicate that *he* was going to kill the President, a jury could conclude that a reasonable person in Hanna's position would foresee that such statements would be perceived as threats by the recipients of the statements. *Cf. Planned Parenthood,* 290 F.3d 1058, 1065 (explaining the significance of context in evaluating threats).

██ Nevertheless, regardless of whether the case was properly submitted to the jury, we are usually obligated in speech cases to "make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression." *Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 499, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984) (quotation marks omitted). We recently clarified the standard of appellate review for speech cases in *Planned Parenthood,* 2002 WL 992667, holding that the appellate court defers to the jury's findings on all but the constitutional facts. Constitutional facts are facts-such as the existence of actual malice or whether a statement is a true threat-that determine the core issue of whether the challenged speech is protected by the First Amendment. Deferring to the jury's findings on historical facts, credibility determinations, and elements of statutory liability, we must consider whether the verdict is supported by substantial evidence. *Id.* at 1070. If we find that it is, we then conduct an independent review of the record to determine whether the facts as found by the jury establish the core constitutional fact, in this case, a "true threat." [5] *Id.; Eastwood v. Nat'l Enquirer,* 123 F.3d 1249, 1252 (9th Cir.1997).

██ In the present case, however, we are unable to conduct an independent review of the record, taking the non-constitutional facts as the jury found them, because the record has been tainted by the trial errors discussed above. Although we are supposed to "determine whether the *believed* evidence" establishes a true threat, *cf. Eastwood,* 123 F.3d at 1252, we have no way of knowing whether the evidence believed in the present case was admissible evidence or the improperly—admitted expert testimony. For instance, it is possible that the jury convicted Hanna because it believed the testimony of the law enforcement agents, not because it concluded that under the particular circumstances of this case, a reasonable person in Hanna's position would foresee that recipients of his communications would interpret them as serious expressions of intent to harm the President.

Accordingly, we reverse and remand for a new trial. If Hanna is convicted again based on admissible evidence, he will be entitled to have the appellate court independently review the record to ensure that the surrounding facts found by the jury establish the constitutional fact of a true threat. At this point, it suffices to say that

---

5. A number of our previous cases suggest that the trier of fact's finding of a "true threat" under the First Amendment is reviewed on appeal under the deferential "sufficiency of the evidence" standard, which requires us to affirm if, viewing the evidence in the light most favorable to the prosecution, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Orozco Santillan,* 903 F.2d at 1264–66; *see also United States v. Gordon,* 974 F.2d 1110, 1117–18 (9th Cir.1992); *United States v. Gilbert,* 884 F.2d 454, 457–58 (9th Cir.1989); *Mitchell,* 812 F.2d at 1255; *Merrill,* 746 F.2d at 461–63. To the extent these cases suggest a standard of review inconsistent with that announced in *Planned Parenthood,* they have been overruled by our *en banc* decision in that case. *See Planned Parenthood,* 290 F.3d 1058, 1066–70.

it is not so clear as a matter of law that Hanna's speech is protected that it would violate the First Amendment to subject Hanna to a new trial.

**REVERSED AND REMANDED.**