WARDLAW, Circuit Judge,
concurring in part, and dissenting in part:
I concur fully with the majority’s analysis of the law of “true threats.” The First Amendment prohibits the criminalization of pure speech unless the government proves that the speaker specifically intended to threaten. Thus, in every threats case the Constitution requires that the subjective test is met. Virginia v. Black, 538 U.S. 343, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003). In this case, the statute at issue, 18 U.S.C. § 879(a)(3), also requires that a reasonable person would foresee that his statement would be perceived as a threat to harm a presidential candidate. Because there is sufficient evidence supporting a finding of objective intent, Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), and because even under the heightened standard of review that we apply to constitutional facts, Planned Parenthood of the Columbia/Willamette, Inc. v. Am. Coal. of Life Activists, 290 F.3d 1058, 1070 (9th Cir.2002) (en banc), the subjective intent requirement is also met, I conclude there is sufficient evidence to find Mr. Bagdasarian guilty of threatening harm against then-presidential candidate Barack Obama.
I.
In the wee hours of the morning of October 22, 2008, Mr. Bagdasarian, under the user name “californiaradial,” joined a Yahoo! Finance — American International Group message board, an internet site on which members of the public could post messages concerning financial matters, AIG, and other hot topics of the day. Californiaradial’s first posting about candidate Obama, at 1:00 a.m., was to the “thread” headed “re: Hamas, Hezbollah, Syria, and Iran favor Obama 100 to 0,” where he said “blow up all the mother fkers, please carpet bomb the middle east ... give me the switch, no prob, thump and poof sand niggar.”[1] Two minutes later on the same thread he posted: “I would really lose no sleep if middle morons gone ... nuke bombing....” At 1:15 a.m., under another thread with the subject header “OBAMA,” he posted the first of the two threats charged in the indictment: “fk the niggar, he will have a 50 cal in the head soon.” Six minutes after that, Californiaradial combined his pro-bomb and anti-Obama rhetoric in another post on the “OBAMA” thread: “yea, the honest people have NO guns and the scum bags, niggars and drug fks do, thanx obombhaaaaa.” He reiterated his racist animus on a thread referencing Obama’s Irish heritage: “full monkey, hey can you crank the music box, I wanna see the puppet monkey dance.... ” Four minutes later, at 1:26 a.m. he added, “a lepraaaaaaniggggggggamuch? blank that one, yahoo a-holes.” At 1:35 a.m., Californiaradial created his own anti-Obama thread, under the subject header “shoot the nig.” There he posted the second threat charged in the indictment: “country fkd for another 4 years+ , what nig has done ANYTHING right? ? ? ? long term? ? ? ? never in history, except sambos.”
At this point, the other message board participants reacted to the serious nature of Californiaradial’s threats. “Dan757x” immediately responded on the “shoot the nig” thread: “You’ve been reported by me, a good ole’ white boy.” “Freddie226” weighed in to support Dan, who next post *1125 ed: “I hope everyone reports this type of garbage.” Under the same thread, “Sniperlagent” posted: “Be advised Federal Law Enforcement is monitoring ...,” and “Brown.romaine” advised: “I am reporting this post to the Secret Service.” And, in fact, John Base, a retired Air Force officer who saw Californiaradial’s “shoot the nig” message did report the threats to the Los Angeles Field Office of the United States Secret Service because, as set forth in the Stipulated Facts, he was “concerned that the posting threatened harm to Barack Obama.”
In response, a Secret Service agent searched the message board, located the “shoot the nig” posting, and also discovered the “50 cal in the head” posting. From Yahoo!, the Secret Service obtained the IP address for the user registered as “californiaradial,” and it used that information to get subscriber data from Cox Communications. This trail of bread crumbs led the Secret Service to La Mesa, California, and, on November 21, 2008, agents appeared at Californiaradial’s doorstep.
They discovered that, in the real world, the user known as “californiaradial” in cyberspace was Mr. Bagdasarian. Mr. Bagdasarian admitted to posting the “fk the nig” and “50 cal in the head” message from his home computer. When asked, he stated that he had weapons in his home. A search warrant executed a few days later revealed that Mr. Bagdasarian possessed six firearms, including a Remington model 700 ML .50 caliber muzzle-loading rifle. Agents also discovered .50 caliber ammunition in Mr. Bagdasarian’s home. The agents searched Mr. Bagdasarian’s computer, where they discovered a November 4, 2008, email message from Mr. Bagdasarian to an associate with the foreboding subject line “Re: And so it begins.” The email stated, “Pistol? ? ? Dude, Josh needs to get us one of these, just shoot the nigga’s car and POOF!” The email then provided a link to a photograph of a rifle on a Barrett Rifles website. A second email that Mr. Bagdasarian sent the same day under the same subject line stated, “Pistol ... plink plink plink Now when you use a 50 cal on a nigga car you get this.” The email then directed the reader to a YouTube video of a car being blown up.
II.
“Whether a particular statement may properly be considered to be a threat is governed by an objective standard— whether a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of intent to harm or assault.” Planned Parenthood, 290 F.3d at 1074 (quoting United States v. Orozco-Santillan, 903 F.2d 1262, 1265 (9th Cir.1990)). “Alleged threats should be considered in light of their entire factual context, including the surrounding events and reaction of the listeners.” Orozco-Santillan, 903 F.2d at 1265. “[Cjontext is critical in a true threats case and history can give meaning to the medium.” Planned Parenthood, 290 F.3d at 1078. In determining whether Mr. Bagdasarian’s statements constituted objective threats, we must look “at the entire factual context of those statements including: the surrounding events, the listeners’ reaction, and whether the words are conditional.” United States v. Gordon, 974 F.2d 1110, 1117 (9th Cir.1992).
Reading the two statements charged in the indictment in isolation, the majority dissects them to conclude that they were not even threats. It fails to consider the ominous backdrop of America’s history of racial violence, the uniquely racial and violent undercurrents of the 2008 presidential election, the entirety of Mr. Bagdasarian’s postings on October 22, two weeks before the 2008 election, and the listeners who not only perceived the posts as threatening *1126 when they were made, but who acted on that perception.[2]
Mr. Bagdasarian’s statements portended no less impending harm because they did not completely spell out the threat. For example, given this country’s history of Ku Klux Klan violence, a burning cross can signify “a message of intimidation” and “the possibility of injury or death.” Black, 538 U.S. at 357, 123 S.Ct. 1536. Parking a Ryder truck outside an abortion clinic, after the Oklahoma City bombing, can indicate a serious intent to harm. Planned Parenthood, 290 F.3d at 1078-79. And, as the district court recognized, in the wake of September 11, telling a flight attendant that you are carrying a bomb is not a joke. Mr. Bagdasarian posted at a time when violent and racist threats against candidate Obama were being taken very seriously. Though President Obama currently resides in the White House, the prospect of his election ignited polarizing racial animus, including “racist chatter on white supremacist Web sites.” Nedra Pickier, Racial Slur Triggers Early Protection for Obama, Associated Press, May 4, 2007. Not only did this animus materialize in at least one viable assassination attempt, see Dave McKinney, Frank Main & Natasha Korecki, A Plot Targeting Obama?, Chi. Sun-Times, Aug. 26, 2008,[3] but the heightened fear that candidate Obama would be the target of violence spurred the Department of Homeland Security to authorize Secret Service protection as early as May 2007, before candidate Obama was even nominated for the presidency, making him the only presidential candidate to receive protection so early.[4] Pickier, Racial Slur.
Certainly as of fall 2008, our country’s collective experience with internet threats and postings that presaged tragic events made it all the more likely that a reasonable person would foresee that even anonymous internet postings would be perceived as threats.[5] The country had witnessed the 1999 Columbine High School shootings by Dylan Klebold and Eric Harris, who had posted death threats on his website, along with discussions of bombmaking and killing students and teachers. See Michael Janofsky, Parents Want New Inquiry into Colum *1127 bine Killings, N.Y. Times, Jan. 6, 2002; Kirk Johnson, Columbine Evidence Is Placed on Chilling Public Display, N.Y. Times, Feb. 27, 2004; Kim Murphy, Warning Signs of Massacre Were Hidden in Plain Sight, L.A. Times, May 9, 1999. In 2005, days after an Orange County teenager posted on an Internet message board that he would “start a Terror Campaign to hurt those that have hurt me,” the teen went on a neighborhood shooting spree, killing a man and his daughter. Kimi Yoshino, Threats Online: Is There a Duty to Tell?, L.A. Times, Nov. 2, 2005. Also in 2005, a teenager who was an “avid participant in Internet discussion groups ... with postings under his name that mention weapons and violence amid broader conversations about politics, the paranormal, time travel, reincarnation and Big Foot” killed seven people and himself at his high school in Minnesota. Kirk Johnson, Survivors of High School Rampage Left with Injuries and Many Questions, N.Y. Times, Mar. 25, 2005.
And in 2007, following a disturbing online posting, a Virginia Tech student shot and killed thirty-two people on the campus. Benedict Carey, For Rampage Killers, Familiar Descriptions, “Troubled” and “Loner, ” but No Profile, N.Y. Times, Apr. 18, 2007. In the wake of this experience, it is only logical to conclude that online postings of impending violence would be perceived by reasonable people as serious threats. As one district attorney put it following yet another student’s threat to shoot his classmates, “Any kid that makes a direct threat of this nature on the tail of what happened in Santee can reasonably expect there to be a very dramatic reaction.” Ofelia Casillas, Teen Pleads Not Guilty to Making Bomb Threat, L.A. Times, Mar. 20, 2001.
In a similar case involving internet threats, a federal district judge in 2009 denied a motion filed by Harold Turner, a blogger and internet radio host, seeking to dismiss an indictment against him for threatening three judges of the United States Court of Appeals for the Seventh Circuit. On his blog, Turner had posted information about the judges, and had written: “Let me be the first to say this plainly: These judges deserve to be killed. Their blood will replenish the tree of liberty. A small price to pay to assure freedom for millions.” David Kravets, Blogger Threatened to Murder Judges, Feds Say, Wired, June 24, 2009. The district court found that the fact that Turner, who lived in New Jersey, posted threats against Chicago-based judges did not diminish the threat, reasoning:
In an era when physicians have been murdered in their places of worship; families of Judges have been slain; a Judge of the Eleventh Circuit Court of Appeals and State Court Judges have been blown up or shot; a Federal Courthouse ripped apart by homemade explosives, all in the name of political dissent or religious fanaticism, it cannot be said that Defendant’s.
United States v. Turner, 2009 WL 7265601, at *3 (E.D.N.Y.2009). As the majority points out, Turner was subsequently convicted.
The majority does not dispute that Mr. Bagdasarian’s statements were nonconditional,[6] alarming, and dangerous, but finds *1128 their threatening nature blunted by the fact that Mr. Bagdasarian posted them on a financial “non-violent” message board. Although the message board itself focused on AIG’s 2008 financial meltdown, the individuals who posted naturally veered into the political implications of the crashing financial markets.[7] Mr. Bagdasarian’s own postings on the board contained increasingly political, violent, and vicious attacks targeting candidate Obama. That he posted on a financial message board does not diminish the nature of the threats; just as they would be no less diminished had he shouted them on the floor of the New York Stock Exchange.
The majority focuses narrowly on the charged threats and dismisses them as mere imperatives or predictions. But our case law is to the contrary. We do not require that the speaker in a threats case explicitly threaten that he himself is going to injure or kill the intended victim; rather, we examine the surrounding circumstances to determine whether a reasonable person in the speaker’s shoes would foresee that his statements would be perceived as threats.
For example, in United States v. Hanna, 293 F.3d 1080, 1082-83 (9th Cir.2002), we determined that there was sufficient evidence for a jury to conclude that Hanna had threatened the President,[8] where no explicit threat had been made. Rather, the documents underlying the charges merely depicted President Clinton along with statements such as “KILL THE BEAST,” “666,” “willie jeffer jackal,” and “WANTED FOR MURDER, DEAD OR ALIVE.” We held that: “Although Hanna did not explicitly indicate that he was going to kill the President, a jury could conclude that a reasonable person in Hanna’s position would foresee that such statements would be perceived as threats by the recipients of the statements.” Id. at 1088.
Similarly, in United States v. Romo, 413 F.3d 1044, 1051 (9th Cir.2005), an opinion relied upon by the district court, we upheld a threats conviction where then-incarcerated Romo “wrote and mailed a letter stating that someone should put a bullet in the President’s head and that he would like to do it.” We found this to be an “unequivocal” threat, stating that a “clearer threat is difficult to imagine.” Id. at 1050, 1051. And, in Planned Parenthood, anti-abortion activists circulated on the internet and elsewhere a series of “WANTED” and “GUILTY” posters identifying doctors who performed abortions, and who were thereafter murdered, along with a “Nuremberg Files” poster where lines were drawn through the names of the murdered physicians. Although the posters did not contain an explicit threat of harm, it was proper to consider them in context. Planned Parenthood, 290 F.3d at 1064-65. We concluded substantial evi *1129 denee supported convictions under the FACE Act,[9] in that the anti-abortionist group “was aware that a Vanted’-type poster would likely be interpreted as a serious threat of death or bodily harm by a doctor in the reproductive health services community who was identified on one, given the previous pattern of ‘WANTED’ posters identifying a specific physician followed by that physician’s murder.” Id. at 1063. We were “independently satisfied” that the posters “amounted to a true threat” and were not protected speech.[10] Id.
Most telling were the contemporaneous reactions of the recipients of Mr. Bagdasarian’s posted threats.[11] At least four individuals indicated that they perceived “shoot the nig” as a threat to candidate Obama, and the threat was in fact reported to the United States Secret Service, which then launched into action to prevent the threat from materializing. There can be no doubt that “construing the evidence in the light most favorable to the prosecution,” Nevils, 598 F.3d at 1166 (citing Jackson, 443 U.S. at 319, 99 S.Ct. 2781), there was sufficient evidence for “a rational juror” to find objective intent. Id.
III.
Although it is a closer question, as questions of subjective intent generally are, after independently reviewing the record, I believe the district court did not err in finding that Mr. Bagdasarian subjectively *1130 intended to threaten presidential candidate Obama. To prove subjective intent, the government must show that “the speaker means to communicate a serious expression of an intent to commit an unlawful act of violence.” Black, 538 U.S. at 359, 123 S.Ct. 1536. The government need not prove that Mr. Bagdasarian “himself will kill” candidate Obama, but need demonstrate only the intent to threaten. “The speaker need not actually intend to carry out the threat. Rather, a prohibition on true threats ‘protects individuals from the fear of violence,’ ... in addition to protecting people ‘from the possibility that the threatened violence will occur.’ ” Id. at 360, 123 S.Ct. 1536 (quoting R.A.V. v. City of St. Paul, 505 U.S. 377, 388, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992)).
In a night of posting on the AIG board, Mr. Bagdasarian made numerous explosive comments aimed at candidate Obama. Although only two of his posts were charged as threats, they, together with his other posts, indicate that he intended to threaten. Others on the message board posted comments that could be described as political rhetoric, but it was Mr. Bagdasarian alone who introduced the posts tinged with violence and racism toward Obama and it was Mr. Bagdasarian alone who took the affirmative step of introducing the ominous thread headed “shoot the nig,” against which the other board participants reacted so strongly. And at the very time that Mr. Bagdasarian posted “fk the niggar, he will have a 50 cal in the head soon,” he possessed in his home a Remington model 700 ML .50 caliber muzzle-loading rifle and .50 caliber ammunition with which to load it. See United States v. Sutcliffe, 505 F.3d 944, 959 (9th Cir.2007) (concluding that possession of a weapon is evidence of subjective intent to threaten where the threat involves the infliction of harm).
As the district court found, Mr. Bagdasarian’s posts were not casual one-off comments. When other participants confronted him with the gravity of starting a thread labeled “shoot the nig” by indicating they were reporting him and that law enforcement was monitoring him, he evidenced his own belief that his posts were threatening. First, he wanted to know “which [law enforcement] agency” was monitoring the message board. Then he began to make excuses for his threatening comments, posting: “Listen up, crybaby ole white boy, I was drunk.”
Mr. Bagdasarian had imbibed some alcohol that night, but it did not prevent him from tracking the conversations occurring on multiple threads and posting responses over a seven-hour period. Moreover, his postings that night were specific, relevant to the context of each thread and even included wordplay. If anything, his intake of “vino,” as he described it, may have lowered his inhibitions sufficiently that he was in fact posting his genuinely held views about Obama, including a true expression of his intent to threaten the candidate with harm. As the district court found, that Mr. Bagdasarian was drinking does not make his statements any less threatening than they were at the time he made them, and his 8:00 a.m. posting that he was drunk when he started the “shoot the nig” thread at 1:35 a.m. that morning only indicates that he woke up to realize the serious nature of his threats.
And Mr. Bagdasarian’s continuing threats of harm to President-elect Obama two weeks later, when he was presumably sober, further evidence his intent to threaten. He sent two emails on Election Day headed: “And so it begins.” The first, which provided a link to the “www. barrettrifles.com” website depicting a Barrett model 82al rifle, stated: “Josh needs to get us one of these, just shoot the nigga’s car and POOF!” The second provided a link to a YouTube video showing a *1131 car being blown up. That email stated: “Pistol ... plink plink plink Now when you use a 50 cal on a nigga car you get this.”
The evidence demonstrates that Mr. Bagdasarian, an adult man who knowingly possessed a .50 caliber rifle, intentionally posted on the “OBAMA” thread: “fk the niggar, he will have a 50 cal in the head soon,” understanding he had access to that very weapon and could implement the threat. Only twenty minutes later he initiated the “shoot the nig” thread, under which he wrote “country fkd for another four years+ , what nig has done ANYTHING right? ? ? ? long term? ? ? ? never in history, except sambos.” That Mr. Bagdasarian later made a public apology does not detract from his intent at the time; his intent to threaten harm to candidate Obama generated fear for the candidate’s safety and mobilized the Secret Service, which tracked Mr. Bagdasarian down. Mr. Bagdasarian did not come forward; the Secret Service had to locate him. He hid behind his “californiaradial” cloak of anonymity with the hope, one can infer, that he would not be found out. Therefore, independently reviewing the entire record, I conclude that at the time Mr. Bagdasarian made the charged threats, he acted with the specific intent to threaten candidate Obama.
IY.
The prohibition on true threats “protects individuals from the fear of violence and from the disruption that fear engenders.” Black, 538 U.S. at 360, 123 S.Ct. 1536 (citation and internal quotation marks omitted). Undoubtedly, the need for protection takes on exceptional importance in the context of a presidential candidacy. See Watts, 394 U.S. at 707, 89 S.Ct. 1399 (discussing threats against the president); Roy v. United States, 416 F.2d 874, 877 (9th Cir.1969) (“Thus, it appears that the statute[prohibiting threats against the President] was designed in part to prevent an evil other than assaults upon the President or incitement to assault the President. It is our view that the other evil is the detrimental effect upon Presidential activity and movement that may result simply from a threat upon the President’s life.”). Not only could the fear engendered by true threats limit a candidate’s freedom to participate fully in the debate leading up to the election — thus depriving the campaign process of its valuable public function, see Buckley v. Valeo, 424 U.S. 1, 66-67, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam) — but the failure to take such threats seriously could ultimately deprive our country of a public servant and potential leader. Because the evidence presented at trial as to objective intent is more than sufficient to allow at least one rational trier of fact to find that Mr. Bagdasarian’s statements were threats in violation of § 879(a)(3), and because an independent review convinces me that the constitutional requirement of subjective intent is met, I would affirm Mr. Bagdasarian’s conviction.

. The posts appear here as they do in the record; because of their nature, "sic” designations are omitted.

. The majority also disregards the evidence presented at trial of our country's experience with political assassinations. The sheer number of presidents (nearly ten percent of the presidents who have served) who have been targeted and killed by assailants with guns in our nation’s short history undermines the conclusion that a reasonable person would interpret Mr. Bagdasarian’s "50 cal in the head” comment as a joke or mere political rhetoric. Moreover, as the recent example of the shooting of Arizona Representative Gabrielle Giffords demonstrates, what begins as a bizarre post on the Internet can erupt as a devastating outburst of violence. See Alexandra Berzon, John R. Emshwiller & Robert A. Guth, Postings of a Troubled Mind, Wall St. J., Jan. 12, 2011; Marc Lacey & David M. Herszenhorn, Congresswoman Is Shot in Rampage Near Tucson, N.Y. Times, Jan. 9, 2011.

. A similar plot planned on the internet by white supremacists involving a killing spree that would end with the assassination of candidate Obama was derailed by the arrest of two men who were charged with, among other things, making threats against a major presidential candidate. See Richard A. Serrano, Pair Accused of Plotting to Kill Obama, 102 Blades, L.A. Times, Oct. 28, 2008. A Wisconsin man who threatened over the internet to kill President-elect Obama shortly before the inauguration for what he claimed was the "country’s own good” was arrested in Mississippi. Obama Threat Leads to Arrest, L.A. Times, Jan. 17, 2009.

. Then-Senator Hillary Clinton received Secret Service protection throughout her candidacy due to her status as a former First Lady. Pickier, Racial Slur.

. The majority acknowledges that a speaker’s anonymity can render a statement more threatening.

. The majority cites Watts v. United States, 394 U.S. 705, 708, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969) (per curiam), for the proposition that we must interpret Bagdasarian’s statements in light of our national commitment to free and open political debate. While this principle is undoubtedly correct, Watts itself is inapposite. Black's subjective intent requirement prevents free and open public debate from being swept up in the prohibition of "true threats.” In Watts, however, the Supreme Court examined the defendant's statement under the objective standard and con- *1128 eluded that the statement at issue would not be perceived as a threat because the statement was “expressly conditional,” rather than immediate. Id. Thus, not only does Watts fail to support the majority’s assertion that Bagdasarian’s meaning was "plain,” it lends further support to my view of the objectively threatening nature of Bagdasarian's postings, which were not conditional.

. A thread headed "re: Nobodys Watchin the Store in America” emerged on which "Sheeeyaright” posted "its up to us.No Obama.” There ensued a colorful discussion about how the economic situation had changed during the administrations of President Clinton and President Bush, and what might be expected from a President Obama. This led to still other threads not started by Mr. Bagdasarian entitled "Obama will make the U.S. a 3rd world Country” and "Hamas, Hezbollah, Syria, and Iran favor Obama 100 to 0.”

. In Hanna, we reversed the conviction only due to other trial errors which indicated that the jury’s deliberations may have been tainted by improperly admitted evidence.

. The Freedom of Access to Clinic Entrances Act ("FACE”) makes it a crime when a person "by force or threat of force ... intentionally injures, intimidates or interferes with ... any person because that person is or has been ... obtaining or providing reproductive health services.” 18 U.S.C. § 248(a)(1).

. That Hanna and Romo do not deal with Black's subjective intent requirement does not discount the persuasiveness of the objective intent analysis in those cases. Black clarified that the subjective test governs whether a statement constitutes a "true threat”; it did not disturb how we have applied the objective test. Thus, the holdings of Hanna and Romo, analyzing the threats under the objective standard and concluding it was satisfied where the speakers "stated or at least suggested that the President should be killed,” remain controlling authority as to the objective standard. Hanna, 293 F.3d at 1088. We reversed the conviction in Hanna only because of certain improperly admitted evidence which may have tainted the jury's deliberations. Therefore, this reversal does not detract from Hanna ’s holding that the suggested threat to the President met the objective standard. Nor does the fact that Romo declined to address whether Romo’s speech constituted a "true threat” bear any relevance to this discussion. As the majority itself reiterates, when First Amendment issues are raised, the subjective intent standard must be applied to determine whether the speech is a "true threat” that may be constitutionally criminalized. Romo's objective test analysis is pertinent here, and it remains good law. See Romo, 413 F.3d at 1051-52.

.The majority is correct that none of the other message board participants used the word "threat” in reaction to Bagdasarian's postings, but that they perceived a threat to candidate Obama is made obvious by their postings that the threats had been "reported” and their references to "Federal Law Enforcement” and the "Secret Service.” The majority then erroneously relies on its own speculation to conjure up other possible reasons for the readers’ reactions. Even if the comments did support the inferences suggested by the majority, however, the trial court made a finding that the readers’ comments confirmed that Bagdasarian's postings were objectively perceived as threats, and we "must defer to that resolution.” See United States v. Nevils, 598 F.3d 1158, 1164 (9th Cir.2010) (en banc) (“[Wjhen 'faced with a record of historical facts that supports conflicting inferences’ a reviewing court 'must presume — even if it does not affirmatively appear in the record — that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.’ ” (quoting Jackson, 443 U.S. at 326, 99 S.Ct. 2781)).