**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
           *Plaintiff-Appellee,*

           v.

ROBERT ALLEN ROMO,
           *Defendant-Appellant.*

No. 04-30131

D.C. No.
CR-02-00134-SEH

OPINION

Appeal from the United States District Court
for the District of Montana
Sam E. Haddon, District Judge, Presiding

Argued and Submitted
February 15, 2005—Seattle, Washington

Filed July 5, 2005

Before: Betty B. Fletcher, M. Margaret McKeown, and
Ronald M. Gould, Circuit Judges.

Opinion by Judge McKeown;
Concurrence by Judge B. Fletcher

**COUNSEL**

Robin B. Hammond, Assistant Federal Defender, Federal Defenders of Montana, Billings, Montana, for the appellant.

James E. Seykora, Assistant U.S. Attorney, Billings, Montana, for the appellee.

---

**OPINION**

McKEOWN, Circuit Judge:

Robert Romo appeals his conviction for threatening the President in violation of 18 U.S.C. § 871(a). Although he confessed to a licensed counselor that he made such a threat, he now claims that the counselor's trial testimony was admitted in violation of the psychotherapist-patient privilege. We conclude that the testimony was not privileged because Romo's statements to the counselor did not occur during the course of diagnosis or treatment. We are not persuaded that Romo's challenge to the testimony of the Director of Mail Analysis for the White House merits reversal, nor does Romo's challenge to the sufficiency of the evidence withstand scrutiny in light of the substantial evidence of his knowing and willful threats against the President.

**BACKGROUND**

This case arises out of a confession Romo made during a meeting with Donald LaPlante, the Program Director at the Dawson County Adult Correction and Detention Facility where Romo was incarcerated. LaPlante is a licensed professional counselor whose job included providing inmates with psychological counseling and a host of other duties, ranging from arranging social events to providing classes and acting as a case manager. Before the meeting that sparked the chain

of events leading to Romo's conviction, LaPlante had provided Romo with mental health treatment during voluntary counseling sessions.

In October 2002, Romo requested a meeting with LaPlante. Although Romo did not have a counseling session scheduled and LaPlante did not know why Romo wanted to see him, the two met in a private visitation room at the detention facility. Romo immediately confessed that he had written a threatening letter to the President. Before Romo went any further, LaPlante warned that he would have to report the letter to law enforcement officials. Despite the warning, Romo went on to tell LaPlante exactly what he had written: that someone should put a bullet in the President's head and he would be the person to do it. Romo also told LaPlante that he had mailed the letter to the White House.

After the meeting, LaPlante called the Secret Service and reported to Agent David Thomas that Romo had sent a threatening letter to the President. LaPlante's call prompted Agent Thomas to interview Romo. Agent Thomas gave Romo his Miranda warnings. Romo repeated to Agent Thomas what he told LaPlante, that he had written and mailed a letter to the President stating that someone should put a bullet in the President's head and he was willing to do it. Romo elaborated that he would try to punch, hit, or shoot the President if the President came to the jail.

Around the same time as the meeting between LaPlante and Romo, Romo told Bertha Wiseman, a correctional officer, that he had his inmate transport sheet in his cell.[1] Because inmates were not allowed to keep the transport sheets in their cells, Wiseman searched Romo's cell to retrieve the sheet. On

---

[1]Inmate transport sheets contain identifying information about inmates and are prepared when inmates are transported between prison and court. A transport package had been prepared for Romo in mid-October, near the time he met with LaPlante.

the transport sheet, which contained Romo's picture and name, were the words "So you know whos [sic] coming to kill you Mr. George W. Bush you fucking traitor." The lower right-hand corner of the sheet contained a thumb print and Romo's signature. During his interview with Agent Thomas, Romo acknowledged that he had written the words on the sheet, signed it, and put his thumb print on it.

At trial, LaPlante and Agent Thomas both testified that Romo told them he had written and sent a threatening letter to the President. The government did not produce the letter itself, but it explained that all mail sent to the White House between October 2001 and April 2002 had been delivered to a storage warehouse, not to the White House. Redirecting the mail was part of a post-September 11 security measure designed to reduce the risk of delivery of anthrax. Thus, Romo's letter was likely in a storage warehouse and not retrievable for trial because of the mountains of other mail stored there. Instead of the letter, the prosecution introduced the testimony of Gertrude Roddic, the Director of Mail Analysis for the White House, who offered up her extensive experience handling letters to the President. Although she had never seen Romo's letter, she testified that if she read a letter with the language Romo used, she would deem it a direct threat against the President. The government also introduced the inmate transport sheet. The jury convicted Romo.

## ANALYSIS

## I. THE PSYCHOTHERAPIST-PATIENT PRIVILEGE

Romo claims that his confession to LaPlante is protected by the psychotherapist-patient privilege. We review de novo both the district court's denial of Romo's motion to suppress, *United States v. Garcia*, 205 F.3d 1182, 1186 (9th Cir. 2000), and the district court's ruling on the scope of the privilege, *United States v. Chase*, 340 F.3d 978, 981 (9th Cir. 2003) (en banc).

**[1]** The Supreme Court has recognized a psychotherapist-patient testimonial privilege, holding that "confidential communications between a licensed psychotherapist and her patients in the course of diagnosis or treatment are protected from compelled disclosure . . . ." *Jaffee v. Redmond*, 518 U.S. 1, 15 (1996).[2] Under *Jaffee*, to invoke the benefit of the privilege, Romo bears the burden of showing that 1) LaPlante is a licensed psychotherapist, 2) his communications to LaPlante were confidential, and 3) the communications were made during the course of diagnosis or treatment. As the contact between Romo and the therapist was not for diagnosis or treatment, this appeal can be resolved on the basis of the third element.

The district court found the privilege inapplicable because the meeting between LaPlante and Romo was not a counseling, treatment, or therapy session. The court's determination about the nature of the session is a finding of fact to which we owe deference. *See United States v. Bynum*, 362 F.3d 574, 578 (9th Cir. 2004) (factual findings underlying the denial of a motion to suppress are reviewed for clear error). We will not disturb this finding of fact "unless upon review we are left with the definite and firm conviction that a mistake has been committed." *United States v. Doe*, 155 F.3d 1070, 1074 (9th Cir. 1998) (en banc).

To determine whether the district court committed clear error, we consider the meaning of the third element of the privilege, the element that requires the communication to be made "in the course of diagnosis or treatment." *Jaffee*, 518 U.S. at 15. The Supreme Court left the task of defining this and the other elements of the privilege to the lower courts, *see id.* at 18, but in the few years since *Jaffee*, the courts have

---

[2]Although Romo roots his privilege claim in the Fifth Amendment's Due Process Clause, the psychotherapist-patient privilege is not predicated on the Constitution. *Henry v. Kernan*, 197 F.3d 1021, 1031 (9th Cir. 1999). Rather, the privilege is an evidentiary one. *Id.*

added little flesh to the "course of diagnosis or treatment" requirement.

Whether a meeting occurred "in the course of diagnosis or treatment" is a factual determination that rests upon consideration of the totality of the circumstances. Relevant factors may include the historical nature of the relationship between the individual and his confidante; the patient's purpose in making the communication; the nature of the contact; the timing and location of the communication; objective data, such as medical records, which corroborate the counseling contact; and whether mental health services were provided or requested during the communication. Standing alone, the fact that a therapist has previously provided mental health care to a patient does not establish that a subsequent meeting was in the course of diagnosis or treatment. Even in the face of an ongoing patient-therapist relationship, the patient and therapist may have contacts that do not involve therapy. Thus, we pay special attention to the particulars of the meeting during which the allegedly privileged information was exchanged.

We add texture to these factors by looking to the evidentiary rule on the psychotherapist-patient privilege that was proposed to Congress in 1972 by the Chief Justice.[3] *See Chase*, 340 F.3d at 990 (because the Supreme Court has recognized the psychotherapist-patient privilege and cited favorably to Proposed Rule 504 as proposed, "the contents of the [Proposed Rule] have considerable force and should be consulted when the psychotherapist-patient privilege is invoked") (quoting 3 Weinstein's Federal Evidence § 504.02, at 504-07)

---

[3]The Proposed Rules were drafted by the Judicial Conference Advisory Committee on Rules of Evidence, approved by the Judicial Conference of the United States and by the Supreme Court, and submitted to Congress by the Chief Justice. *Trammel v. United States*, 445 U.S. 40, 47 (1980). Among the Proposed Rules were nine testimonial privileges, including a psychotherapist-patient privilege. Proposed Fed. R. of Evid. 501-513, 56 F.R.D. 183, 230-61 (1972). Congress did not adopt the Proposed Rules. *Trammel*, 445 U.S. at 47.

(alteration in original). Proposed Rule 504 defines "psycho-therapist" as a person authorized to practice medicine or reasonably believed by the patient to be so authorized "*while engaged* in the diagnosis or treatment of a mental or emotional condition." Proposed Fed. R. of Evid. 504(a)(2)(A), 56 F.R.D. 183, 240 (1972) (emphasis added).

**[2]** According to the definition, the privilege applies only when a therapist practices his craft, not whenever a therapist and a patient communicate. The therapist's purpose—that is, whether to provide psychiatric care or not—whether he was held out as a therapist, and whether he actually delivered such care are indicators of whether the therapist was "engaged in diagnosis or treatment." Without citing to Proposed Rule 504, we have embraced this notion that the therapist's purpose and whether the therapist is held out as a counselor are relevant considerations. *Oleszko v. State Comp. Ins. Fund*, 243 F.3d 1154, 1157 (9th Cir. 2001) (extending the psychotherapist-patient privilege to Employee Assistance Program consultants because their purpose is to provide counseling, they are held out as counselors, and their job is to "extract personal and often painful information" to help clients). In short, the therapist's intent and indicia that psychotherapy services were provided during the encounter figure into the determination whether a communication occurred in the course of diagnosis or treatment.

**[3]** Proposed Rule 504 also highlights that the patient's purpose in communicating with his therapist may factor into our analysis. The psychotherapist-patient privilege protects "confidential communications, made *for the purposes of* diagnosis or treatment of [a] mental or emotional condition." Proposed Federal Rule of Evidence 504(b), 56 F.R.D. at 241 (emphasis added). *See, e.g.*, *United States v. Schwensow*, 151 F.3d 650, 657-58 (7th Cir. 1998) (holding that statements made to volunteers for an Alcoholics Anonymous Hotline were not privileged because the appellant approached the volunteers to obtain an address for a detoxification center, not to obtain

treatment or a diagnosis); *Tesser v. Bd. of Educ.*, 154 F. Supp. 2d 388, 393 (E.D.N.Y. 2001) ("[W]hether the privilege attaches requires consideration of the nature, timing and the purpose of the communication."); *Barrett v. Vojtas*, 182 F.R.D. 177, 181 (W.D. Pa. 1998) (when appellants did not seek treatment, but rather were ordered to see the psychotherapist, the ensuing psychotherapist-patient relationships were not the type contemplated when the Supreme Court recognized the privilege).

[4] Romo's purpose is of no help because we know nothing about his specific intentions, although the circumstances of the meeting do not suggest in the slightest that he was seeking counseling. The record is devoid of evidence that the meeting involved therapy, diagnosis, or treatment of any kind. LaPlante noted in a contemporaneous writing that he did not consider the conversation privileged, which indicates that his purpose was not to provide therapy. Consistent with LaPlante's view, he provided no therapy or other mental health care at the meeting. Romo simply blurted out the information about the threat and seemed to understand that LaPlante would not keep his confession as a secret.[4] That LaPlante had previously provided Romo with therapy does not mean that every interaction between the two constituted a therapy session, and this particular meeting involved no therapy.

[5] The diverse nature of LaPlante's work at the Dawson County facility bolsters the district court's conclusion that LaPlante did not provide mental health care during the meeting at issue. LaPlante's job was not limited to counseling pris-

---

[4]Even though LaPlante told Romo that he would report threatening statements, that comment does not implicate our analysis. Had Romo established the elements of the privilege, LaPlante's warning that he had a duty to report threats would not have abrogated the psychotherapist-patient privilege. *Chase*, 340 F.3d at 988-89 (rejecting the argument that the privilege is destroyed when a patient is told that a communication will be reported to law enforcement).

oners. His duties were wide-ranging and included providing rehabilitative classes, acting as a case manager, and coordinating social and religious services. LaPlante's job title reflected the breadth of his duties; he was denoted as a "program director," not a "therapist" or "counselor." When LaPlante met with inmates, he sometimes provided counseling, but the purpose of the encounters varied from visit to visit. This variety of duties precludes an assumption that LaPlante's meeting with Romo was a psychotherapy session or that Romo and LaPlante had established an exclusive psychotherapist-patient relationship.

**[6]** In sum, the evidence squarely supports the district court's conclusion that the meeting between LaPlante and Romo did not occur during the course of diagnosis or treatment. Indeed, on this record, we are without *any* evidence suggesting that the session was related to therapy or diagnosis. Accordingly, we affirm the district court's finding that Romo's statements to LaPlante are not privileged.

## II. Admissibility of Roddic's Testimony

The prosecution endeavored to strengthen its case with testimony from Gertrude Roddic, the Director of Presidential Correspondence in the Division of Mail Analysis for the White House. Roddic testified that her office would have deemed Romo's letter a direct threat to the President. Romo argues that Roddic offered expert testimony, which is inadmissible on the issue of whether a reasonable person would have foreseen that a statement would be interpreted as a serious threat. *United States v. Hanna*, 293 F.3d 1080, 1086 (9th Cir. 2002) (holding that judge abused his discretion by permitting expert testimony on whether a reasonable person would foresee communication as threatening because laypeople are qualified to analyze the question). We agree.

Roddic worked at the White House for over fifteen years in various jobs that involved presidential correspondence. Her

current position requires her personally to read between three hundred and one thousand letters every day. Her division analyzes every single piece of mail sent to the President "from Dear Sir to Sincerely." The division, according to Roddic's estimate, processes between 20,000 and 400,000 pieces of mail each day. Her office employs a specific protocol for handling potentially threatening letters that involves identifying such letters and immediately notifying the Secret Service.

After Roddic explained her duties, the prosecutor asked the following hypothetical question: "If in fact you received, either yourself or one of your analysts, a letter that said something to the effect that someone should put a bullet in the head of the President of the United States, would you consider that a serious threat?" The question incorporated the language that Romo confessed to writing to the President. Over an objection by Romo's counsel, Roddic testified that her office would consider such a letter a direct threat.

**[7]** Roddic's statement that the letter would have been deemed a threat was expert testimony, although the threat language was so explicit that expert testimony was hardly called for. The testimony was based, not on her personal reaction to Romo's letter, which she had never seen, but on her fifteeen years' experience analyzing letters to the President and on office protocol. Her statement, a response to a hypothetical question based on experience, was a classic example of expert testimony. *United States v. Figueroa-Lopez*, 125 F.3d 1241, 1246 (9th Cir. 1997) (holding that testimony based, not on perception, but on education, training, and experience is expert testimony).

**[8]** Roddic testified on the issue that was the heart of the case—whether a reasonable person in Romo's position would foresee that the letter would be interpreted as a serious threat. *Hanna*, 293 F.3d at 1084 (liability under 18 U.S.C. § 871(a) requires that a reasonable person would foresee that the statement would be interpreted by those to whom the maker com-

municates the statement as a serious threat); *Roy v. United States*, 416 F.2d 874, 877-78 (9th Cir. 1969) (same). No expert testimony was necessary on that point because the average juror requires no assistance assessing what a reasonable person would foresee. *Hanna*, 293 F.3d at 1086; Fed. R. Evid. 702 (expert testimony is admissible only when scientific, technical, or other specialized knowledge will assist the trier of fact). Not only was the jury without need for Roddic's expert assistance, but her evaluation of Romo's language was particularly unhelpful. Her position makes her highly sensitive to threats and far from an accurate bellwether of what a reasonable person would foresee. We therefore hold that the district court abused its discretion by admitting Roddic's expert testimony that Romo's letter would have been considered a threat by the White House mail office.

**[9]** Nonetheless, admission of Roddic's testimony was harmless. Nonconstitutional evidentiary errors are harmless when the government shows "a 'fair assurance' that the verdict was not substantially swayed by the error." *United States v. Bauer*, 132 F.3d 504, 510 (9th Cir. 1997). We have no doubt the jury would have convicted Romo even without Roddic's testimony. Deciding whether a reasonable person would have foreseen that Romo's letter would be perceived as a threat did not require the jury to make a difficult call. Romo announced that he would put a bullet through the President's head. A clearer threat is difficult to imagine. Roddic's single line of testimony was mere decorative icing on a cake thickly frosted with evidence that a reasonable person would have foreseen that Romo's letter would be perceived as threatening.

## III. SUFFICIENCY OF THE EVIDENCE

**[10]** Romo next challenges his conviction on the ground that the government presented insufficient evidence. He specifically notes that the government failed to produce the letter he wrote. The jury's finding must stand if, "after viewing the

evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). The essential elements of threatening the President are the knowing and willful deposit for conveyance in the mail or for a delivery from any post office or by any letter carrier a writing containing a threat to take the life of, to kidnap, or to inflict bodily harm on the President, or otherwise knowingly or willfully making such a threat. 18 U.S.C. § 871(a).[5] To obtain a conviction under 18 U.S.C. § 871(a), the government must prove that a statement is a true threat, which has been defined as

> a statement, written or oral, [made] in a context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of an intention to inflict bodily harm upon or to take the life of the President.

*Hanna*, 293 F.3d at 1084 (quoting *Roy*, 416 F.2d at 877).[6]

---

[5]In its entirety, 18 U.S.C. § 871(a) provides:

Whoever knowingly and willfully deposits for conveyance in the mail or for a delivery from any post office or by any letter carrier any letter, paper, writing, print, missive, or document containing any threat to take the life of, to kidnap, or to inflict bodily harm upon the President of the United States, the President-elect, the Vice President or other officer next in the order of succession to the office of President of the United States, or the Vice President-elect, or knowingly and willfully otherwise makes any such threat against the President, President-elect, Vice President or other officer next in the order of succession to the office of President, or Vice President-elect, shall be fined under this title or imprisoned not more than five years, or both.

[6]The recent decision in *United States v. Cassel*, 408 F.3d 622 (9th Cir. 2005), does not change our view. *Id.* at 633 (holding that "speech may be deemed unprotected by the First Amendment as a 'true threat' only upon

**[11]** It is unequivocal that Romo intentionally wrote a threat against the President and placed it in the mail. The statute does not require receipt of the threat by the intended recipient. Romo does not dispute that he wrote and mailed a letter stating that someone should put a bullet in the President's head and that he would like to do it. LaPlante and Agent Thomas both testified that Romo confessed to writing and sending the letter.[7] Romo clarified his threat by writing on his transport sheet, which contained his picture, name, and thumb print, "So you know whos [sic] coming to kill you Mr. George W. Bush you fucking traitor." And if that were not enough evidence, Romo told Agent Thomas that he would hit or shoot the President if he had the opportunity.

**[12]** Although the government did not produce the letter itself, it offered a reasonable and credible explanation. As a security response to the anthrax scare that followed the September 11 terrorist attacks, *see, e.g.*, Stephen Engelberg & Judith Miller, *Sign of Escalating Threat*, N.Y. Times, Oct. 17, 2001, at A1 (providing a description of the anthrax crisis,

---

proof that the speaker subjectively intended the speech as a threat"). *Cassel* leaves untouched the reasonable person analysis for presidential threats because it did not address whether statutes like 18 U.S.C. § 871(a) require intent. *Id.* at 633 n.8 ("We are not faced with the question of what effect our holding has on other specific statutes that we have previously held do not require the government to prove subjective intent."). Because Romo has not raised First Amendment issues and *Cassel* does not alter the analysis of presidential threats, we employ the decades-old approach to analyzing threats under 18 U.S.C. § 871(a). *See, e.g.*, *Roy*, 416 F.2d at 877.

[7]Romo's statements to Agent Thomas were entirely voluntary. Agent Thomas delivered Miranda warnings, and Romo has not pointed to any evidence that the state compelled him to speak or would have penalized him had he remained silent. *See United States v. Antelope*, 395 F.3d 1128, 1137 (9th Cir. 2005) (explaining that under *McKune v. Lile*, 536 U.S. 24, 53 (2002) (O'Connor, J., concurring), "the key factor in assessing a prisoner's self-incrimination claim was whether the disputed penalty . . . amounted to an 'atypical and significant hardship' within the prison context").

which involved anthrax sent to Congress in letters), no mail sent to the President between October 2001 and April 2002 was delivered to the White House. Instead, the mail was stored in a warehouse. Then between April 2002 and early 2003, the White House mail division began processing only a small percentage of the mail received, based on a priority list, with the remainder of the mail going to the warehouse. As Romo mailed his letter sometime in early October 2002, it likely would have been sent to the warehouse and no member of the White House mail correspondence division would have directly received Romo's letter. By the time of Romo's trial, White House personnel had begun sorting through the stored mail, but they had not completed the gargantuan task. The sheer volume of the accumulated mail prevented officials from picking out a particular letter, like Romo's, for analysis or for introduction at trial. Just as a needle might remain in a haystack despite efforts to find it, Romo's letter apparently remained buried among the mail inside the warehouse.

Romo does not seriously dispute that the language in the letter, which stated that "someone should put a bullet in your head, and I'm willing to do it," constituted a true threat. Although he emphasizes that he would not have been able to act on the threat because of his incarceration, his argument has no legal significance. Because the threat itself is the crime, a defendant can be guilty of a violation of 18 U.S.C. § 871(a) even when he is incapable of carrying out the threat. *United States v. Mitchell*, 812 F.2d 1250, 1255-56 (9th Cir. 1987), *overruled on other grounds by Planned Parenthood of the Columbia/Willamette, Inc. v. Am. Coalition of Life Activists*, 290 F.3d 1058, 1066-70 (9th Cir. 2002) (en banc).

[13] Viewed in the light most favorable to the prosecution, we conclude that the evidence was sufficient to show that Romo wrote and sent a threatening letter to the President in violation of 18 U.S.C. § 871(a).

**AFFIRMED.**

B. FLETCHER, Circuit Judge, concurring:

I concur in the result but I must take exception to one point of analysis in the majority's opinion. It is not necessary to reach the issue of patient-psychotherapist privilege to decide this case. Overwhelming evidence that Romo violated 18 U.S.C. § 871 by threatening the life of the President was presented at trial, including the testimony of a Secret Service Agent that Romo confessed to sending a threatening letter and a signed transport sheet on which Romo repeated his threat against the President, signed his name, and stamped his thumb print. The therapist's testimony only repeated the Secret Service Agent's testimony. If admitting the therapist's testimony was error, it was harmless error. *See United States v. Bauer*, 132 F.3d 504, 510 (9th Cir. 1997). Nevertheless, the majority opinion reaches the issue of whether the therapist's testimony should have been excluded as privileged. I respectfully disagree with the majority's conclusion that Romo's conversation with his therapist LaPlante was not privileged.

The Supreme Court affirmed a patient-psychotherapist privilege under Rule 501 of the Federal Rules of Evidence in *Jaffee v. Redmond*, 518 U.S. 1, 15 (1996). The requirements of the privilege are: (1) the communications must be confidential; (2) the therapist must be a licensed psychotherapist; and (3) the communications must occur in the course of diagnosis or treatment. *Id*. I agree with the majority that the first two factors are not in doubt. LaPlante is a licensed psychotherapist and Romo's communications to LaPlante were confidential. I disagree with the majority's conclusion that Romo's communications did not occur in the course of diagnosis or treatment.

Prior to Romo mailing a threatening letter to the President, LaPlante in his capacity as a licensed professional counselor, met with Romo on multiple occasions to provide Romo with mental health treatment. Romo and LaPlante's most recent

meeting, before the meeting where the letter was discussed, was a confidential counseling session.

Romo went to LaPlante, on the day in question, to discuss the letter because he was troubled by what he had done. LaPlante said that at the session Romo "was concerned that he had done something very dumb. I asked him what that was. He indicated that he wrote a letter to the President." At the session LaPlante listened to Romo and discussed Romo's concerns. At the suppression hearing LaPlante said he would not turn over his notes from the session without permission from Romo or a court order.

The meeting between Romo and LaPlante mirrors the characteristics of a counseling session. When a patient contacts his therapist, with whom he has an on-going patient-therapist relationship, to discuss a problem the patient is having and the patient and therapist subsequently meet and discuss the problem the resulting conference is a counseling session. This is exactly the course of events that occurred between Romo and his therapist LaPlante. To conclude otherwise disregards the reality of the psychiatrist-patient relationship and the nature of psychiatric treatment.