# FILED

JUL 22 2019

SUSAN M. SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

**ORDERED PUBLISHED**

## UNITED STATES BANKRUPTCY APPELLATE PANEL
## OF THE NINTH CIRCUIT

| | |
|---|---|
| In re: | BAP No. CC-18-1067-SFL |
| FRANK JAKUBAITIS, | Bk. No.   8:13-bk-10223 |
| Debtor. | Adv. No. 8:15-ap-01020 |
| FRANK JAKUBAITIS, | |
| Appellant, | |
| v. | **OPINION** |
| CARLOS PADILLA, III; JEFFREY IAN GOLDEN; RICHARD A. MARSHACK, | |
| Appellees. | |

Argued and Submitted on February 21, 2019
at Pasadena, California

Filed – July 22, 2019

Appeal from the United States Bankruptcy Court
for the Central District of California

Honorable Theodor C. Albert, Bankruptcy Judge, Presiding

Appearances:    Appellant Frank Jakubaitis, on brief, pro se; Arash Shirdel
                of Pacific Premier Law Group argued for Appellees
                Carlos Padilla, Jeffrey Ian Golden, and Richard A.
                Marshack.

Before: SPRAKER, FARIS, and LAFFERTY, Bankruptcy Judges.

SPRAKER, Bankruptcy Judge:

## INTRODUCTION

This appeal concerns a discovery dispute arising in an action to revoke the chapter 7[1] discharges of Frank Jakubaitis and his wife Tara Jakubaitis. The complaint named three plaintiffs: Carlos Padilla, Jeffrey Golden (Mr. Jakubaitis' chapter 7 trustee), and Richard Marshack (Mrs. Jakubaitis' chapter 7 trustee) (jointly, "Plaintiffs"). The complaint also sought turnover of allegedly undisclosed assets.

Mr. Jakubaitis unsuccessfully sought a protective order barring deposition questions arising from his counsel's statements to the court that certain medications he was taking made it "impossible to give meaningful or accurate deposition testimony." More specifically, Jakubaitis challenges the portion of the order permitting the Plaintiffs to ask deposition

---

[1] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532.

questions, "including but not limited to diagnosis, medication prescribed and taken, purpose for the prescription, and side effects of drugs." Order Denying Motion For Protective Order (Feb. 20, 2018). Jakubaitis contends that having to answer any questions on these subjects would violate his psychotherapist-patient privilege.

Questions regarding the medication Jakubaitis is taking, how long he has been taking the medication, and the side effects he is experiencing are beyond the scope of the privilege, so long as the questions do not require Jakubaitis to divulge communications between him and his psychotherapist. However, questions regarding his diagnoses and the purpose of the medication he is taking directly inquire into the advice of his psychotherapist and hence are privileged.

Jakubaitis did not waive the privilege with respect to diagnoses and purposes of his medication. On this record, neither of the two recognized variants of privilege waiver doctrine have been triggered by Jakubaitis's disclosures or his litigation positions. Accordingly, we AFFIRM IN PART and REVERSE IN PART.

## FACTS

In January 2015, Plaintiffs commenced their adversary proceeding under §§ 542 and 727(d). By all accounts, the litigation is highly contentious and has generated a great deal of animosity. Even so, most of the facts we rely on are procedural in nature and not subject to legitimate dispute.

In January of 2017, Plaintiffs noticed Jakubaitis' deposition.[2] On the eve of the noticed deposition date, Jakubaitis served the Plaintiffs with an opposition to the deposition notice. In relevant part, Jakubaitis stated through his counsel of record, "the deponent is currently under the effects of prescription medication which makes it impossible to give meaningful or accurate deposition testimony."

Jakubaitis did not attend the deposition as scheduled. Plaintiffs thereafter sought and obtained an order compelling Jakubaitis' attendance at the deposition as well as $3,000 in sanctions.

On March 29, 2017, Jakubaitis filed his first motion for protective order. In it, his counsel reiterated Jakubaitis' prior statement that "the effects of prescription medication make it impossible to give meaningful and accurate deposition testimony." He also stated through his counsel:

> A deposition is part of the conflict-oriented nature of litigation. Face-to-face adversaries. Spontaneous responses. But as in any conflict, an aura of combat continues to hover, and combat produces casualties. The prescription medications can create an uneven field of battle by altering Defendant's ability to respond, remember, and understand a question posed. This puts Defendant at risk of harassment and elevated aggravation

---

[2] The deposition notice is attached to a declaration the Plaintiffs filed in support of a January 19, 2017 motion to compel. We can and do take judicial notice of the filing and contents of this motion to compel, as well as the other documents filed in the main case and the adversary proceeding. *See Ozenne v. Bendon (In re Ozenne)*, 337 B.R. 214, 218 (9th Cir. BAP 2006) (citing *O'Rourke v. Seaboard Sur. Co. (In re E.R. Fegert, Inc.)*, 887 F.2d 955, 957 (9th Cir. 1989)).

and stress during the deposition. This puts Defendant at risk of future harassment because the videotape would not present Defendant in the most responsive demeanor and state of mind.

Motion For Protective Order (Mar. 29, 2017) at 4:14-21. The bankruptcy court denied the first protective order motion. Jakubaitis has not appealed that order.[3]

The deposition eventually took place in June 2017. However, this did not end the discovery dispute. At the deposition, Jakubaitis asserted that his medication no longer was an obstacle to his deposition being taken, and no longer was an issue, because he refrained from taking his medication on the day of the deposition. He further maintained that he was cooperating with the discovery as reflected by the deposition questions he did answer. On the other hand, Jakubaitis refused to answer numerous questions concerning, among other things, the medications he had been taking, their side effects, and the causes of his claimed mental health issues.

Once again, Plaintiffs sought and obtained an order compelling discovery from Jakubaitis, which required him to answer the unanswered deposition questions. This order provided for the possibility of terminating

---

[3] The order compelling attendance at the deposition and the order denying Jakubaitis' first protective order motion are beyond the scope of this appeal. Even so, Jakubaitis' above-referenced statements about the effect of his medications on his ability to testify and about his sensitivity to situations resembling combat are critical to this appeal. Plaintiffs' contention that Jakubaitis waived the psychotherapist-patient privilege is based solely on these statements.

sanctions if Jakubaitis did not succeed in obtaining a protective order restricting or eliminating the unanswered deposition questions and if Jakubaitis continued to refuse to answer the questions posed. Jakubaitis has not appealed this order either.

On January 10, 2018, Jakubaitis filed his second protective order motion. Citing *Jaffee v. Redmond*, 518 U.S. 1 (1996), Jakubaitis claimed that Plaintiffs' deposition questions impinged on his psychotherapist-patient privilege. He further maintained that this privilege was absolute and that he had done nothing to waive it. More specifically, he contended that his statements regarding his medications and their effect on his mental state did not constitute a privilege waiver. He also pointed out that he had not asserted any affirmative defenses raising any issue as to his mental condition.

On January 18, 2018, Plaintiffs filed their opposition to the second protective order motion. Among other things, Plaintiffs argued that Jakubaitis had waived the privilege, or rendered it inapplicable, by placing at issue his mental health. Even if the privilege were generally applicable and not waived, Plaintiffs reasoned that their unanswered deposition questions did not impinge on the privilege because the privilege only covered communications and their deposition questions were not asking for any communications.

On February 15, 2018, the bankruptcy court held a hearing on the

second protective order motion. In essence, the bankruptcy court ruled that Jakubaitis' statements about the effect of his medications on his clarity of mind were troublesome because Jakubaitis had not disclosed sufficient information to enable either the court or the Plaintiffs to meaningfully assess Jakubaitis' credibility or the accuracy of any of his testimony. To address this concern, the court held that Plaintiffs were entitled to ask questions regarding: "what the drugs were, what the side effects were, if he's feeling the effects of the side effects, those types of questions." *See* Hr'g Tr. (Feb. 1, 2018) at 17:3-5. At the same time, the court agreed with Jakubaitis that Plaintiffs should not be permitted to ask questions about specific communications between Jakubaitis and his psychotherapist.

The bankruptcy court entered its order denying Jakubaitis' second protective order motion on February 20, 2018. The order in relevant part provided as follows:

> The motion is DENIED, except that Plaintiff[s] cannot ask questions regarding the specifics of conversations between Frank Jakubaitis and his psychotherapist. However, Plaintiffs can ask questions, including but not limited to diagnosis, medication prescribed and taken, purpose for the prescription, and side effects of drugs.

Order Denying Second Protective Order Motion (Feb. 20, 2018) at 2. Jakubaitis timely appealed.

## JURISDICTION

The bankruptcy court had jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(E) and (J). We have jurisdiction under 28 U.S.C. § 158.[4]

## ISSUES

1.  Did the bankruptcy court's order permitting the Plaintiffs to ask deposition questions relating to Jakubaitis' mental health and his medications cover information within the scope of the psychotherapist-patient privilege?

2.  Did Jakubaitis waive the psychotherapist-patient privilege?

## STANDARD OF REVIEW

Issues regarding the scope of a privilege are reviewed de novo. *United States v. Ruehle*, 583 F.3d 600, 606 (9th Cir. 2009).

Whether a privilege had been waived is a mixed question of law and fact, also reviewed under the de novo standard. *Tennenbaum v. Deloitte & Touche*, 77 F.3d 337, 340 (9th Cir. 1996).

When we review a matter de novo, we consider it anew, as if no bankruptcy court ruling was rendered. *Mele v. Mele (In re Mele)*, 501 B.R. 357, 362 (9th Cir. BAP 2013).

---

[4] The order on appeal is interlocutory. Nonetheless, we previously granted leave to appeal, which affords us jurisdiction to hear appeals from non-final bankruptcy court orders. 28 U.S.C. § 158(a)(3); *Giesbrecht v. Fitzgerald (In re Giesbrecht)*, 429 B.R. 682, 687 (9th Cir. BAP 2010).

## DISCUSSION

### A. Scope Of Privilege.

On appeal, Jakubaitis principally argues that the bankruptcy court erred by construing too narrowly the scope of the psychotherapist-patient privilege. According to Jakubaitis, *Jaffee* established a broad privilege that includes: (1) the identity of medications the patient is taking; (2) when the patient has taken them; and (3) what side effects the patient might have experienced. This is the core information the Plaintiffs sought. Relying on *Jaffee*, Jakubaitis posits that this information must be covered by the privilege because it is inextricably intertwined with the treatments and diagnoses he has received from his mental health care professional, which goes to the heart of the psychotherapist-patient relationship.

In *Jaffee*, the Supreme Court recognized for the first time the existence of a federal common law psychotherapist-patient privilege. *Jaffee* explained that this privilege must exist in order to foster the efforts of psychotherapists to protect and improve their patients' mental health, which *Jaffee* identified as "a public good of transcendent importance." *Jaffee*, 518 U.S. at 11. *Jaffee* reasoned that, to enable mental health care professionals to accurately diagnose and treat mental health issues, it was imperative that the patient and psychotherapist be able to develop a relationship of the utmost trust and confidence in which the patient feels comfortable making "a frank and complete disclosure of facts, emotions,

memories, and fears." *Id.* at 10. Because of the extremely personal, sensitive, and potentially embarrassing nature of such information, the absence of any privilege very likely would impede accurate diagnosis and successful treatment of mental health conditions. *Id. Jaffee* also held that the privilege had to be absolute – not qualified, limited, or conditioned on the balancing of competing interests. *Id.* at 17-18. As *Jaffee* explained, the uncertainty surrounding a limited privilege was "little better than no privilege at all" in terms of encouraging the patient and the therapist to be frank with each other, without fear that their confidential communications later might have to be disclosed in litigation. *Id.*

The same concerns *Jaffee* considered in recognizing the existence and absolute nature of the psychotherapist-patient privilege arguably could justify extending the privilege to the Plaintiffs' medication-related questions. Jakubaitis argues that narrowly circumscribing the scope of the privilege to exclude medication-related questions could impede treatment of mental health issues. More specifically, he contends that such limitations could chill the psychotherapist from prescribing medications, or the patient from taking them. In other words, if the patient fears he later might have to disclose any medications he or she has taken, he or she may refuse to take them. This would seem to significantly undermine the therapeutic process *Jaffe* sought to protect.

On the other hand, privileges generally are construed narrowly,

based on the longstanding rule disfavoring barriers to the discovery and presentation of relevant, probative evidence. "'When we come to examine the various claims of exemption, we start with the primary assumption that there is a general duty to give what testimony one is capable of giving, and that any exemptions which may exist are distinctly exceptional, being so many derogations from a positive general rule.'" *Id.* at 9 (quoting *United States v. Bryan*, 339 U.S. 323, 331 (1950)); *see also Ruehle*, 583 F.3d at 607 ("because it impedes full and free discovery of the truth, the attorney-client privilege is strictly construed"); *Weil v. Investment/Indicators, Research & Mgmt., Inc.*, 647 F.2d 18, 24 (9th Cir. 1981) (same).

Of greater concern, Jakubaitis' broad construction of the psychotherapist-patient privilege, if accepted, would extend *Jaffee* well beyond its narrow holding. *Jaffee* recognized a federal common law privilege for **communications** between the psychotherapist and the patient in the course of diagnosis or treatment. *Jaffee*, 518 U.S. at 10–12, 18. Other courts have applied the psychotherapist-patient privilege to communications. *See, e.g.*, *United States v. Romo*, 413 F.3d 1044, 1046–47 (9th Cir. 2005); *Equal Emp't Opportunity Comm'n v. Cheesecake Factory, Inc.*, Case No. C16-1942JLR, 2017 WL 3887460, at *4 (W.D. Wash. Sept. 6, 2017); *Fitzgerald v. Cassil*, 216 F.R.D. 632, 635 (N.D. Cal. 2003); *see also* 2 Christopher B. Mueller and Laird C. Kirkpatrick, Fed. Evid. § 5:43 (4th ed. 2018) ("the [psychotherapist-patient] privilege covers **conversations** with

11

qualified psychiatrists, psychologists, and clinical social workers, meaning professional therapists who are authorized (licensed or certified) to practice in their callings.") (emphasis added).

We acknowledge that *Jaffee* specifically declined to further define or limit the scope of the privilege. 518 U.S. at 18. Instead, it reserved the scope of the privilege for further development in future case law. *Id.* Nonetheless, we think its references to the privilege as pertaining to "communications" are telling.  Also telling is *Jaffee*'s repeated comparison of the psychotherapist-patient privilege to other testimonial privileges, including the attorney-client privilege. More specifically, *Jaffee* noted that the underlying rationale for the privileges and the holders' ability to waive them were the same for all testimonial privileges, including the psychotherapist-patient privilege. *Id.* at 10, 15 n.14; *see also Koch v. Cox*, 489 F.3d 384, 389-90 (D.C. Cir. 2007) (analogizing psychotherapist-patient privilege to attorney-client privilege in the context of privilege waiver); *Fitzgerald*, 216 F.R.D. at 637 (same). As one leading treatise points out, it is well-established that the attorney-client privilege does not cover non-verbal, non-communicative conduct. *See* 2 Christopher B. Mueller and Laird C. Kirkpatrick, Fed. Evid. § 5:17.

Furthermore, the language of proposed Federal Rule of Evidence 504 supports our interpretation of the privilege. While proposed Rule 504 never was approved by Congress, it is considered persuasive authority on the

scope of the privilege. *See Romo*, 413 F.3d at 1047–48.[5] The proposed rule established a privilege tied to "confidential communications" between the patient and his psychotherapist:

> (b) General rule of privilege. A patient has a privilege to refuse to disclose and to prevent any other person **from disclosing confidential communications, made for the purposes of diagnosis or treatment of his mental or emotional condition**, including drug addiction, among himself, his psychotherapist, or persons who are participating in the diagnosis or treatment under the direction of the psychotherapist, including members of the patient's family.

Proposed Fed. R. Evid. 504(b) (quoted in 56 F.R.D. at 241) (emphasis added).

In sum, *Jaffee* is clear that the psychotherapist-patient privilege applies to communications. In fashioning the privilege, the Supreme Court relied upon the attorney-client privilege, which does not extend to non-communicative conduct. Moreover, the general rule embodied in proposed

---

[5] As explained in *Romo*:

> The Proposed Rules were drafted by the Judicial Conference Advisory Committee on Rules of Evidence, approved by the Judicial Conference of the United States and by the Supreme Court, and submitted to Congress by the Chief Justice. Among the Proposed Rules were nine testimonial privileges, including a psychotherapist-patient privilege. Proposed Fed. R. of Evid. 501-513, 56 F.R.D. 183, 230-61 (1972). Congress did not adopt the Proposed Rules.

*Romo*, 413 F.3d at 1047 n.3 (case citations omitted).

Federal Rule of Evidence 504(b) disfavors broad construction of the psychotherapist-patient privilege. Based on this, we are persuaded that Plaintiffs' questions regarding Jakubaitis' medications and their side effects are beyond the scope of the privilege. This appears to have been the focus of the parties before the bankruptcy court. Accordingly, the only pertinent facts currently at issue are the identities of the medications Jakubaitis is, or was, taking and their effect on his ability to testify at his deposition. Those operative facts are discoverable and not protected by the privilege. Requiring Jakubaitis to disclose information regarding the medications he has taken, the period of time he has taken them, and the extent and nature of side effects he has suffered as a result of taking them, does not constitute, or directly implicate, any communication he has had with his psychotherapist. Consequently, questions on these topics are not within the scope and protection of the psychotherapist-patient privilege.[6]

---

[6] Even though we have concluded that the medication-related questions are not privileged, information regarding Jakubaitis' medication likely is still subject to various statutory and constitutional confidentiality and privacy rights. The patient's privacy rights in confidential medical and mental health information are legally distinct from the psychotherapist-patient privilege. *See generally Caesar v. Mountanos*, 542 F.2d 1064, 1067–68 & n.10 (9th Cir. 1976) (addressing interaction of state privilege law with federal and state privacy rights). The parties have not addressed any arguments related to such privacy rights in either the bankruptcy court or on appeal. We decline to address them further except to note that at oral argument before this Panel, Plaintiffs' counsel acknowledged his clients' willingness to stipulate to a protective order restricting further dissemination of any confidential information obtained during discovery regarding Jakubaitis' medications.

While we find no error in the bankruptcy court's decision to compel Jakubaitis to answer questions regarding his medications and their side effects, this does not end our inquiry. The bankruptcy court's order also permitted the Plaintiffs to ask questions regarding diagnoses and the "purpose for the prescription[s]." This portion of the court's order seems to be at odds with the bankruptcy court's oral ruling at the hearing on the second protective order motion, which focused exclusively on "what the drugs were, what the side effects were, if he's feeling the effects of the side effects, those types of questions." *See* Hr'g Tr. (Feb. 1, 2018) at 17:3-5. Moreover, in their opposition to Jakubaitis' second protective order motion filed in the bankruptcy court, Plaintiffs limited their focus exclusively to the need to ask medication-related questions. As they stated, "[s]ince Frank Jakubaitis has repeatedly indicated that he is under the influence of prescription medication, it is important to determine: 1. what said medication is; 2. how long Frank Jakubaitis has been taking the medication; and, 3. the effect (or side effects) of the medication." Opposition to Motion For Protective Order (Jan. 18, 2018) at 5:11-14.

The Plaintiffs' argument at the hearing on the second protective order motion focused on the exact same questions. Indeed, there was no mention at the hearing of a need for diagnoses or the medications' purposes. The Plaintiffs' asserted need to ask these questions was raised for the first time in the draft order they submitted to the court, which the court adopted and

15

entered. Still, the bankruptcy court's order compels Jakubaitis to answer the deposition questions on these items as well as the medication taken and their side effects.

We do not understand how Jakubaitis could answer questions meaningfully about his diagnoses or the purposes of his medications without divulging his communications with his psychotherapist. Indeed, such questions would go to the heart of the psychotherapist-patient relationship, inasmuch as they directly seek information regarding advice the mental health care professional made during the "course of **diagnosis** [and] **treatment**." *Romo*, 413 F.3d at 1047–48 (emphasis added).[7] Nor have Plaintiffs articulated any legitimate need for this information. We, therefore, hold that Plaintiffs' questions regarding diagnoses and the purpose of his medications are within the scope of the psychotherapist-patient privilege.

## B.    Waiver Analysis.

Plaintiffs have continually argued in the alternative that, even if the information they seek falls within the psychotherapist-patient privilege, Jakubaitis has waived the privilege with respect to these questions.

---

[7] The risk to the privilege posed by specific questions is not at issue in this appeal. Neither party has presented us with particular disputed deposition questions. Instead, Jakubaitis has argued that the general deposition topics of his diagnoses and the purposes of his medications would infringe on his psychotherapist-patient privilege.

Notwithstanding *Jaffee*'s statement that the privilege is unconditional, it specifically held that the privilege can be waived "like other testimonial privileges." 518 U.S. at 15 n.14. While it generally left the issue of waiver for future case development, we consider it significant that it referenced other testimonial privileges in the context of discussing waiver.

The bankruptcy court did not specifically rule on whether any waiver occurred. Rather, the bankruptcy court's decision was based on the belief that none of the disputed deposition topics were protected by the privilege. However, both parties addressed the waiver issue. If a waiver occurred, such waiver might serve as an alternate ground for affirmance of the bankruptcy court's order. *See, e.g.*, *Lakhany v. Khan (In re Lakhany)*, 538 B.R. 555, 559 (9th Cir. BAP 2015) (holding that we may affirm on any ground supported on the record); *Nilsen v. Neilson (In re Cedar Funding, Inc.)*, 419 B.R. 807, 816 (9th Cir. BAP 2009) (same). And even though the bankruptcy court did not address the waiver issue, we can address the issue because the de novo standard of review applies to privilege waiver questions, *Tennenbaum*, 77 F.3d at 340, and because the conduct supposedly causing the waiver is not subject to any factual dispute. Simply put, the waiver question presented in this appeal is purely one of law that we may address in the first instance. *Cf. Mano–Y & M, Ltd., v. Field (In re Mortg. Store, Inc.)*, 773 F.3d 990, 998 (9th Cir. 2014) (holding that appellate court may address issue not addressed below if it is purely one of law and does not depend on the factual record, or the relevant part of the record is fully developed).

17

With respect to the attorney-client privilege, the Ninth Circuit has identified and defined two distinct waiver doctrines applicable to privileges: voluntary waiver and waiver by implication. *Bittaker v. Woodford*, 331 F.3d 715, 718–20 & n.4 (9th Cir. 2003) (en banc). We discuss each of these two doctrines separately.

1.      **Express Or Voluntary Waiver.**

The first variant is express or voluntary waiver. It occurs "when a party discloses privileged information to a third party who is not bound by the privilege, or otherwise shows disregard for the privilege by making the information public." *Id*. at 719. The underlying purpose of the voluntary waiver doctrine is "to prevent prejudice to a party and distortion of the judicial process that may be caused by the privilege-holder's **selective disclosure during litigation of otherwise privileged information.**" *Von Bulow v. von Bulow (In re von Bulow)*, 828 F.2d 94, 101 (2d Cir. 1987) (emphasis added).

Accordingly, when the privilege holder makes selective disclosures of privileged information during discovery or in pretrial proceedings – such as in support of a summary judgment motion or in a request for provisional relief – "forensic fairness" dictates that the privilege is waived as to all privileged information on the same subject matter. Restatement (Third) of the Law Governing Lawyers § 79, cmt. f (2000); *see also Weil*, 647 F.2d at 24 ("voluntary disclosure of the content of a privileged attorney communication constitutes waiver of the privilege as to all other such

18

communications on the same subject."). The privilege holder bears the burden to establish that the privilege has not been waived. *United States v. Martin*, 278 F.3d 988, 999–1000 (9th Cir. 2002); *Weil*, 647 F.2d at 25.

The express waiver doctrine applies to the psychotherapist-patient privilege. *See Koch*, 489 F.3d at 390-91; *see also Cheesecake Factory, Inc.*, 2017 WL 3887460, at *6 ("a patient waives the privilege as to confidential communications he discloses to third-party providers for purposes of obtaining benefits.").

We can easily dispose of the express waiver doctrine. Absolutely nothing in the record indicates that Jakubaitis has selectively disclosed privileged information. Furthermore, Plaintiffs' waiver argument – both in the bankruptcy court and on appeal – has been based solely on the statements Jakubaitis made in advance of his deposition regarding the effect of his medications on his ability to testify, and regarding the combat-like nature of deposition practice. In light of our holding regarding the narrow scope of the psychotherapist-patient privilege, neither of these statements amounts to a disclosure of privileged information. Thus, no express or voluntary waiver occurred here.

### 2.    Implicit Waiver.

The second waiver variant is waiver by implication. Generally speaking, an implicit waiver occurs when the holder of the privilege takes some affirmative action in the litigation that puts at issue privileged information. *United States v. Amlani*, 169 F.3d 1189, 1195 (9th Cir. 1999).

19

Typically, such affirmative actions consist of the assertion of a claim for relief or a defense. *See, e.g., Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162 (9th Cir. 1992) (advice of counsel defense); *Stallworth v. Brollini*, 288 F.R.D. 439, 443 (N.D. Cal. 2012) (intentional infliction of emotional distress claim). However, other positions asserted in the course of litigation may also be sufficient to trigger the implied waiver doctrine. *See, e.g., Bittaker*, 331 F.3d at 718–20 (habeas petition based on ineffective assistance of counsel); *Amlani*, 169 F.3d at 1195-96 (attorney disparagement argument made in support of criminal defendant's contention that his Sixth Amendment right to counsel was violated) .

The extent and nature of this waiver is dictated by concerns of fairness. In essence, the court imposing the implied waiver is saying to the privilege holder: "[i]f you want to litigate this claim [or defense], then you must waive your privilege to the extent necessary to give your opponent a fair opportunity to defend against it." *Bittaker*, 331 F.3d at 720.

In the context of the attorney-client privilege, the Ninth Circuit employs a three-part test to determine whether an implicit waiver has occurred. *Amlani*, 169 F.3d at 1195. First, the party asserting the privilege must have engaged in an "affirmative act" that led that party to assert the privilege. *Id.* Second, the asserting party's affirmative act must have put the privileged information at issue. *Id.* And third, application of the privilege must deprive the adverse party of information "vital to its defense." *Id.*

The criminal defendant in *Amlani* asserted that the prosecutor

20

effectively had deprived him of his right to counsel by making disparaging comments about his criminal defense counsel. The defendant maintained that these disparaging comments led him to fire his counsel and replace him with less experienced counsel. *Id.* at 1191. *Amlani* held that the defendant's attorney disparagement claim had placed at issue communications between the defendant and his counsel regarding his reasons for substituting in new counsel. *Id.* at 1195. Thus, *Amlani* concluded that the first two prongs of the implicit waiver test were satisfied. *Id.*

As for the third prong, *Amlani* explained that it is satisfied only when the adverse party has a **genuine need** for the privileged information to counter the assertion or claim that placed the privileged information at issue. *Id.* According to *Amlani*, that need was evident there. *Id.* at 1195-96. *Amlani* reasoned that the prosecution could not, in fairness, be expected to respond to the attorney disparagement claim without being afforded access to privileged communications regarding the substitution of counsel. *Id.* at 1196.

Many cases have extended the implicit waiver doctrine to the psychotherapist-patient privilege. *See Alois v. SkyWest Airlines*, Case No. CV 10-2030 RGK(JCX), 2011 WL 13042434, at *2 (C.D. Cal. Apr. 4, 2011) (partial listing of cases); *Fitzgerald*, 216 F.R.D. at 636 (same). For purposes of this privilege, the Ninth Circuit has not defined what constitutes an affirmative act sufficient to satisfy the first and second prongs of the *Amlani* implicit waiver test. And there is considerable disagreement among district courts

on this issue. As one district court recognized:

> In the wake of *Jaffee*, courts have struggled to determine the circumstances under which waiver of the psychotherapist-patient privilege occurs. Some courts have taken a broad approach to waiver, finding, for example, that mere assertion of a claim for emotional distress damages is enough to justify a finding of waiver. These cases focus on fairness considerations. Other courts have taken a narrow approach, holding that there must be an affirmative reliance on the psychotherapist-patient communication before the privilege is waived. These latter cases are based on the primacy of the privacy interest that is inherent in the privilege. Finally, some courts have taken a "limited broad view" in which they have found waiver where a plaintiff has alleged more than "garden variety" emotional distress and has instead alleged emotional distress that is "complex" or has resulted in specific disorders.

*Stallworth*, 288 F.R.D. at 443 (internal citations omitted) (quoting *Boyd v. City & Cty. of S.F.*, No. C-04-5459 MMC (JCS), 2006 WL 1390423, at *5 (N.D. Cal. May 18, 2006)); *see also Fitzgerald*, 216 F.R.D. at 636-39 (examining at length different approaches to implicit waiver of the psychotherapist-patient privilege and adopting the narrowest approach).

Here, we do not need to wade into the murky waters surrounding the question of whether the implicit waiver doctrine might be narrower in scope in the psychotherapist-patient privilege context than it is in the attorney-client privilege context. We can assume without deciding that the first and second prongs of the *Amlani* implied waiver test were satisfied here when Jakubaitis asserted that the medications he was taking made it

"impossible to give meaningful or accurate deposition testimony." This assertion arguably placed at issue not only the identity of the medications, and the length of time he had been taking them, but also the diagnoses related to these medications and the purposes for which he was taking them.

Even if we assume, however, the first and second prongs of the *Amlani* test have been met, on this record it is obvious that the third prong – regarding the need for the privileged information – decidedly has not been met. The issue regarding Jakubaitis' ability to testify no longer is a live issue. The bankruptcy court ordered Jakubaitis to submit himself for his deposition, and he did so. Furthermore, Jakubaitis repeatedly has stated that he ceased taking his medication on the day of the deposition, so his medication no longer was preventing him from accurately testifying. Under these circumstances, there is no indication that Plaintiffs genuinely needed privileged information regarding Jakubaitis' diagnoses and the purposes of his medications to counter any assertion by Jakubaitis.

Put differently, the record demonstrates that Jakubaitis has abandoned the assertion that formerly placed at issue his mental state and his ability to testify. Under both *Amlani* and *Bittaker*, absent a real and continuing need for the privileged information, an implied waiver will not be imposed. *Bittaker*, 331 F.3d at 720; *Amlani*, 169 F.3d at 1195-96.

The Plaintiffs have expressed the fear that, based on the litigation positions Jakubaitis took in his discovery papers, he will **in the future** seek

to amend or add a defense that he could not have intentionally and purposefully lied in his bankruptcy schedules because he was taking medication at the time that either rendered him incapable of forming such an intent or rendered him incapable of accurately filling out his schedules, through no fault of his own. We know of no implicit waiver cases applying the doctrine based on the mere possibility that the privilege holder might in the future affirmatively act in a way that puts privileged information at issue. Moreover, such a broad interpretation of the waiver doctrine is inconsistent with *Amlani*'s and *Bittaker*'s explanation of the scope of the doctrine. That explanation focuses on what the privilege holder actually is doing, rather than what he or she might do in the future. *See Bittaker*, 331 F.3d at 718-20.[8]

The portion of the bankruptcy court's order directing Jakubaitis to answer questions about his diagnoses and the purposes of his medications impinged on his psychotherapist-patient privilege. Based on the record on appeal, he has not waived the privilege. Accordingly, the portion of the bankruptcy court's order compelling Jakubaitis to answer deposition questions concerning any diagnosis or purpose for medication constitutes reversible error.

---

[8] In any event, the bankruptcy court has the discretion to preclude evidence from Jakubaitis, if appropriate, to the extent he later attempts to add defenses calling into question his mental health. *See Columbia Pictures Television, Inc. v. Krypton Broad. of Birmingham, Inc.*, 259 F.3d 1186, 1195–96 (9th Cir. 2001).

## C.    Alleged Creation Of A New Privilege Exception.

There is one other argument we must address. Jakubaitis contends that, by conducting a balancing test, the bankruptcy court effectively created a new exception to the psychotherapist-patient privilege. As Jakubaitis puts it, this so-called exception is at odds with *Jaffee*'s holding that the privilege is absolute. He additionally complains that this "exception" is not authorized or permitted by the Bankruptcy Code, citing *Law v. Siegel*, 571 U.S. 415, 421 (2014).

This argument has no merit. The bankruptcy court only used its balancing test to ensure protection of Jakubaitis' privacy and confidentiality interests, which extend beyond the scope of the privilege. As we stated above, the patient's privacy rights in confidential medical and mental health information are legally distinct from the psychotherapist-patient privilege. *See Caesar*, 542 F.2d at 1067–68 & n.10.[9] Unlike the privilege, which *Jaffee* described as absolute and unqualified, privacy rights are not absolute. Rather, they are subject to compelling state interests. Courts can employ balancing tests to address the competing interests for

---

[9] *Caesar* deals with the interaction of state privilege law with federal and state privacy rights. We only rely on *Caesar* to the extent of its examination of the privacy rights. State privilege law has no application to this appeal. State privilege law applies only when the evidence sought relates exclusively to state law claims. *Dynamic Fin. Corp. v. Kipperman (In re N. Plaza, LLC)*, 395 B.R. 113, 122 (S.D. Cal. 2008) (citing Fed. R. Evid. Rule 501; *Agster v. Maricopa Cty.*, 422 F.3d 836, 839 (9th Cir. 2005)); *see also Sony Elecs., Inc. v. Hannastar Display Corp. (In re TFT-LCD (Flat Panel) Antitrust Litig.)*, 835 F.3d 1155, 1158 (9th Cir. 2016) (holding that when evidence relates to both federal and state claims, federal common law governs privilege issues).

and against disclosure of the confidential information. *Id.*; *accord Stallworth*, 288 F.R.D. at 444 (holding that the privacy right "is not absolute and, unlike the psychotherapist-patient privilege . . . is subject to a balancing test").

One of the recognized competing public interests is ensuring "that truth is ascertained in legal proceedings in its courts of law." *Caesar*, 542 F.2d at 1069. Here, the bankruptcy court conducted a balancing test. In doing so, its predominant concern was the ability of Jakubaitis to selectively disclose confidential mental health information to undermine the court's ascertainment of the truth:

> Moreover, viewed as a balancing test, Defendant cannot be allowed to interject self-serving claims of treatment or medication every time he is asked about awkward subjects or contradictions in testimony. Since his credibility is central to this case, such a free-floating means of evasion would work a serious disadvantage to the Plaintiff that the law cannot countenance.[10]

The court's balancing of interests also is reflected in its efforts to narrowly tailor the breadth of the required disclosure and to restrict further

_____

[10] This quotation is taken from the court's tentative ruling, which Jakubaitis included in his excerpts of record without any objection from the Plaintiffs. The bankruptcy court never specifically adopted its tentative ruling as its final ruling. Even so, the court made comments at the hearing expressing the same concern about protecting the court's ability to meaningfully assess Jakubaitis' credibility. The court also expressed concern that allowing Jakubaitis to baldly claim without further disclosure that his medications affected his ability to accurately answer questions and his ability to understand those questions would effectively give him a license to lie under oath, without any opportunity for the adverse party to challenge the claim. *See* Hr'g Tr. (Feb. 15, 2018) at pp. 3, 6, 11-12.

dissemination. The court took into consideration Jakubaitis' concerns regarding the potential for abuse of the disclosed confidential information. It addressed those concerns by suggesting ways to restrict the further spread of the disclosed confidential information. It also addressed those concerns by warning the Plaintiffs that unauthorized dissemination of the information could result in severe legal consequences.

In short, the bankruptcy court's use of a balancing test for these purposes was permissible and appropriate. Therefore, we reject Jakubaitis' "new exception" argument.

## CONCLUSION

For the reasons set forth above, we AFFIRM IN PART and REVERSE IN PART the bankruptcy court's order denying Jakubaitis' second protective order motion.